INMAN, Judge.
 

 *455
 
 Respondent-mother ("Mother") appeals, pursuant to N.C. Gen. Stat. § 7B-1001(a)(5) a., from the trial court's permanency planning order and the order terminating her parental rights over her daughter, Megan.
 
 [1]
 
 Mother argues that the trial court (1) violated her constitutional right to effective assistance of counsel when it denied her attorney's motion for continuance at the termination hearing; (2) erred in eliminating reunification as a permanent plan; and (3) erred by ordering that reunification efforts cease. After careful review of the record and applicable law, we affirm the trial court's denial of the motion for continuance and the order ceasing reunification efforts. But we conclude that recent precedent requires that we vacate the permanency planning and termination orders and remand this matter for further proceedings because the trial court failed to include reunification as an initial permanent plan.
 

 I.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 

 The record reflects the following facts:
 

 On 29 July 2016, Megan was born prematurely at 34 weeks to Mother and Father (collectively "the parents"). At birth, Megan exhibited abnormalities and the parents were told to attend follow-up appointments with the pediatrician. After the parents missed two appointments, the Dare County Department of Social Services ("DDSS") became involved.
 

 Father was charged with possession of cocaine on 9 September 2016. On 12 September 2016, DDSS and Mother agreed to a safety plan that Father was to only have supervised contact with Megan. Mother did not follow this plan. She left Megan in Father's care unsupervised at times when she could not find suitable care.
 

 On 21 September 2016, the Dare County Sheriff's Office arrested Father pursuant to a warrant and, following a search of the parents' home, discovered a "marijuana pipe, 10 used syringes, and a spoon with cocaine residue." The next day, DDSS and Mother agreed to a new safety plan, stipulating that, among other things, Father would no longer reside in the home. Mother again failed to adhere to the safety plan. She allowed Father to return to their home, prompting DDSS to file a juvenile petition claiming that Megan was a neglected juvenile. On 23 September 2016, the trial court ordered that Megan be placed in non-secure custody with DDSS.
 

 *456
 
 Following a custody hearing on 3 October 2016, the trial court continued non-secure custody but placed Megan into the care of her maternal grandmother, who lived in Winston-Salem, within Forsyth County. Megan's maternal grandmother was also caring for Mother's two other juvenile children stemming from a voluntary placement agreement with DDSS. Mother was allowed unlimited supervised visitation so long as it was inside the grandmother's home.
 

 Although the plan approved by the trial court was for Mother to reside in Winston-Salem and provide regular care to her two other children and Megan in their grandmother's home, she did not follow through.
 

 *499
 
 She lived with the grandmother for two days, but then left, and visited Megan only once between 5 and 20 October. Mother struggled to sustain a proper living situation and had no contact with DDSS following the custody hearing until 20 October 2016, when the grandmother fell ill and could no longer care for the children. DDSS assumed care of Megan and placed her into her former foster care home.
 

 Mother and Father then stipulated that Megan was a neglected juvenile pursuant to Section 7B-101(15) of our General Statutes. On 14 November 2016, after an adjudication hearing, the trial court adjudicated Megan neglected and ordered that she remain in non-secure custody of DDSS. Mother was allowed "at least one visit" with Megan before a December dispositional hearing date and any other visits "as may be arranged," on the conditions she participate in mental health and substance abuse treatment services, undergo psychological evaluations, refrain from consumption of alcohol and drugs, submit to drug testing, establish stable housing, and maintain regular communication with DDSS.
 

 Mother's living and work circumstances reportedly improved, although they were not verified to the trial court or DDSS. Mother told DDSS that she rented a room in her uncle's
 
 [2]
 
 house in Winston-Salem and that he employed her to do office work in his real estate business.
 

 In January 2017, the trial court transferred Megan's case to Forsyth County, concluding that Dare County was an inconvenient forum, and the Forsyth County Department of Social Services ("FDSS") substituted for DDSS and placed Megan in a new foster home.
 

 *457
 
 After a hearing in February 2017, the trial court on 17 April 2017 ordered that non-secure custody remain with FDSS but that reunification efforts continue. The trial court ordered that for Mother to regain full custody of Megan, she was required to, among other things, abstain from consuming drugs and alcohol; perform any drug screening requested by FDSS, with a refusal to cooperate being interpreted as a positive result; submit to psychological evaluations; notify foster care within 24 hours of any change in her employment or household status; arrange a family services agreement to work toward reunification; participate in Megan's medical appointments; comply with the visitation plan of two visits per week at Megan's daycare under a social worker's supervision; complete parenting classes; and confirm her employment and wages.
 

 During the next hearing, on 8 May 2017, FDSS introduced evidence that Mother had failed to comply with the court-ordered conditions to regain custody of Megan. Specifically, Mother (1) had not enrolled in or completed any parenting classes; (2) often missed, was late to, or canceled visitation appointments with Megan; and (3) did not fully cooperate with drug testing. Mother's urine tested positive for cocaine in February 2017, and she did not attend a February hair testing appointment, saying she did not think she had to go because she was required to complete a substance abuse assessment from the previous positive test. In March, Mother successfully completed a urine test but not a hair test. Although she stated previously that she had completed hair testing for Dare County, she told the trial court that she did not perform the hair test because she had never done it before. When confronted by FDSS, Mother then explained that her adherence to the religion of Islam prevented her from performing the hair tests because the test required her to cut her hair; but FDSS reported that Mother "does cut, color and not cover her hair." Mother maintained to FDSS that she was being financially supported by her uncle and was remodeling the older home and planned for her family to live there. She also stated that her uncle had promoted her to the position of vice president of his company and had increased her responsibilities and salary. However, Mother failed to provide any verification of the hours she worked, her salary, or her job title. Furthermore, Megan's social worker learned
 
 *500
 
 from a relative and one of Mother's older children's teachers that Father had been seen residing in Mother's home and picking up the child from school in January 2017.
 

 Mother did not arrive at the hearing until near the end, after FDSS had introduced evidence and the trial court announced its ruling from the bench to continue custody with FDSS. By written order on 12 July 2017, the trial court kept custody with FDSS and conditioned reunification
 
 *458
 
 with Megan on Mother's cooperation with all of the trial court's previously ordered conditions. The order also included findings of fact adopting the evidence presented by FDSS.
 

 In June 2017, Mother notified Megan's social worker via email that her father was diagnosed with a terminal illness, and she traveled with her two other children to Georgia to care for him. Sometime between the end of July and early September, Mother emailed to her attorney that her father's health had deteriorated and that she no longer had a support system in Winston-Salem as she could not live in her uncle's home or work for his real estate business anymore. Mother wrote in July that she was living in a motel in Portsmouth, Virginia, and that she was receiving counseling in Chesapeake, VA for her anxiety and depression. She did not have a phone until the first week of September after starting a job at a Waffle House. Though she explained that she was in dire straits, Mother told her attorney she intended to attend the next hearing in September and requested that it be continued one week.
 

 On 8 September 2017, the trial court convened the first and only permanency planning hearing. Mother did not attend. Mother's attorney requested a continuance, arguing that additional time was needed because Mother was still out of state and wanted to send information relevant to the trial court's permanent plan via facsimile. After FDSS objected to the motion, Mother's attorney agreed for the hearing to start that day but requested that it be "continue[d] [ ] in progress." Mother's attorney advised the trial court that she had spoken with Mother on the phone that morning as well as the day before, and, prior to that, their last contact was by email in July.
 
 [3]
 
 Megan's social worker also stated to the trial court that her last line of communication with Mother was between 27 and 29 June 2017, when she notified Mother of Megan's ear surgery. The trial court summarily denied the motion.
 

 Between the May and the September hearings, Mother attended only three of 37 scheduled visits with Megan, one of which she attended for 12 minutes. She last visited Megan in June. Mother never verified that she completed a substance abuse assessment; complied with drug testing for over three months; participated in Megan's medical appointments for June, July, and August 2017; notified foster care within 24 hours of
 
 *459
 
 any change in employment or household status; or complied with the family services agreement formulated in February.
 

 On 25 October 2017, following the permanency planning hearing, the trial court found that there was a "slim likelihood of reunification" between Mother and Megan as she was (1) "not making adequate progress within a reasonable period of time;" (2) not "actively participating in or cooperating with the plan;" (3) not available to the trial court for hearings; and (4) "acting in a manner inconsistent with the health or safety" of Megan. The trial court ordered that FDSS cease reunification efforts and ordered that the primary permanent plan for Megan be adoption, with a secondary plan of guardianship.
 

 On 9 February 2018, the trial court heard FDSS's motion to terminate Mother's parental rights regarding Megan, with Mother in attendance. Mother's attorney again motioned for a continuance, arguing that she had little contact with Mother prior to the hearing date. The trial court denied the motion.
 

 *501
 
 Mother testified in the hearing that she had been residing in motels in Virginia Beach since June 2017.
 
 [4]
 
 She stated that she had been working for a construction company in Virginia since November 2017 as an insurance claims specialist and contractor, earning $650 a week, and that she had been attending parenting classes and participating in mental health and drug assistance programs. Mother, however, failed to verify her circumstances with the social worker. She also admitted that, as of the hearing date, she could not care for Megan.
 
 [5]
 

 By order written on 18 April 2018, the trial court terminated Mother's parental rights regarding Megan
 
 [6]
 
 after finding that Mother (1) failed to verify completion of substance abuse assessments; (2) failed to adhere to drug screening requests; (3) continually had no stable living environment and did not verify her working and living situation in Virginia; (4) with the exception of three payments, failed to provide financial support for Megan; and (5) consistently had minimal to no contact with Megan, last visiting in June 2017. Mother appeals.
 

 *460
 

 II.
 
 ANALYSIS
 

 A. Effective Assistance of Counsel
 

 Mother first argues that the trial court violated her constitutional right to effective assistance of counsel when it denied her attorney's motion for continuance at the termination hearing. Generally, a trial court's decision concerning a motion to continue is reviewed for abuse of discretion; however, "the denial of a motion to continue presents a reviewable question of law when it involves the right to effective assistance of counsel."
 
 In re Bishop
 
 ,
 
 92 N.C. App. 662
 
 , 666,
 
 375 S.E.2d 676
 
 , 679 (1989). Questions of law are reviewed
 
 de novo
 
 .
 
 Staton v. Brame
 
 ,
 
 136 N.C. App. 170
 
 , 174,
 
 523 S.E.2d 424
 
 , 427 (1999).
 

 "Parents have a right to counsel in all proceedings dedicated to the termination of parental rights," including the right to effective assistance of counsel.
 
 In re L.C.
 
 ,
 
 181 N.C. App. 278
 
 , 282,
 
 638 S.E.2d 638
 
 , 641 (2007) (quotations and citation omitted). We held in
 
 Bishop
 
 :
 

 The right to effective assistance of counsel includes, as a matter of law, the right of client and counsel to have adequate time to prepare a defense. Unlike claims of ineffective assistance of counsel based on defective performance of counsel, prejudice is presumed in cases where the trial court fails to grant a continuance which is essential to allowing adequate time for trial preparation.
 

 92 N.C. App. at 666
 
 ,
 
 375 S.E.2d at 679
 
 (quotations and citations omitted). But, if the "lack of preparation for trial is due to a party's own actions, the trial court does not err in denying a motion to continue."
 

 Id.
 

 (citing
 
 State v. Sampley
 
 ,
 
 60 N.C. App. 493
 
 ,
 
 299 S.E.2d 460
 
 (1983) ).
 

 In support of her argument, Mother contends that, notwithstanding that she and her attorney communicated via "phone and by e-mail and by text," they lacked sufficient face-to-face communication to prepare adequately for the termination hearing. The record shows that FDSS filed its motion to terminate Mother's parental rights on 17 November 2017, almost three months before the motion was heard on 9 February 2018. Additionally, Mother had the same attorney during the 8 September 2017 hearing and as early as the trial court's 17 April 2017 order keeping non-secure custody of Megan with FDSS. Mother does not justify the necessity of in-person preparation-other than citing bare "logistical difficulties" for the distance she had to travel-as her attorney admitted that they had otherwise been communicating effectively for several months and that Mother has had the same attorney of record for about a year.
 

 *461
 
 Mother states in her brief that "[t]here was no indication from [her attorney's] motion that [she] did not keep in contact with counsel and did not attempt, as best
 
 *502
 
 she could, to cooperate with counsel." Mother offers no legal authority on the importance of having face-to-face communication with one's attorney when alternative means have been employed. Nor does she explain why or how her attorney would have been better prepared had the hearing been continued.
 
 [7]
 
 Accordingly, we hold that Mother was not deprived of effective assistance of counsel and the trial court did not err in denying the motion to continue.
 

 B. Reunification and Reunification Efforts
 

 Mother contends that N.C. Gen. Stat. § 7B-906.2(b) required the trial court to include reunification in its initial permanent plan, so that the trial court had no statutory authority to conclude otherwise. Following controlling precedent, we agree.
 

 When juveniles are adjudicated abused, neglected, or dependent, Chapter 7B provides for, among other things, "services for the protection of juveniles by means that respect ... the juveniles' needs for safety, continuity, and permanence." N.C. Gen. Stat. § 7B-100(3) (2017). Chapter 7B expressly delineates the procedural responsibilities and duties of the court, the requisite county department of social services, and the affected parties. N.C. Gen. Stat. §§ 7B-100
 
 et seq.
 
 (2017). Importantly, Chapter 7B establishes the "standards for the removal, when necessary, of juveniles from their homes and for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents." N.C. Gen. Stat. § 7B-100(4) (2017). In the event that the trial court removes custody of the juvenile from the parents, "there shall be a review hearing designated as a permanency planning hearing" within 12 months from the date of the initial order. N.C. Gen. Stat. § 7B-906.1(a) (2017).
 

 At the permanency planning stage involving a neglected juvenile, the trial court must adopt concurrent permanent plans consisting of a primary and secondary plan. N.C. Gen. Stat. §§ 7B-906.2(a), (b) (2017). If determined to be in the juvenile's best interest, the trial court can adopt two of the six statutory plans, including adoption, guardianship,
 
 *462
 
 reinstatement of parental rights, and reunification. N.C. Gen. Stat. § 7B-906.2(a). When deciding which plans to impose, Chapter 7B instructs the trial court as follows concerning reunification:
 

 At any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan. Reunification shall remain a primary or secondary plan unless the court made findings under [N.C. Gen. Stat. §] 7B-901(c)
 
 [8]
 
 or makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. The court shall order the county department of social services to make efforts toward finalizing the primary and secondary permanent plans and may specify efforts that are reasonable to timely achieve permanence for the juvenile.
 

 N.C. Gen. Stat. § 7B-906.2(b). The language of Section 7B-906.2(b) seems plainly to provide that a trial court, in any permanency planning hearing, can omit reunification as a concurrent plan if it determines that reunification efforts are either futile or contrary to the juvenile's well-being.
 

 Our interpretation of Section 7B-906.2(b), however, is controlled by a prior decision by this Court. Mother cites this Court's recent decision in
 
 *503
 

 In re C.P.
 
 , --- N.C. App. ----,
 
 812 S.E.2d 188
 
 (2018), and argues that it requires this Court to vacate the trial court's order omitting reunification from its initial concurrent permanent plan. In
 
 In re C.P.
 
 , the respondent-mother appealed the trial court's award of permanent guardianship of her child to the child's half-brother following the initial permanency planning hearing.
 

 Id.
 

 at ----,
 
 812 S.E.2d at 190
 
 . After we held that the trial court could hold joint adjudicatory, initial disposition, and initial permanency planning hearings, we agreed with the respondent-mother that "reunification
 
 must
 
 be part of an
 
 initial
 
 permanent plan."
 

 Id.
 

 at ----,
 
 812 S.E.2d at 191
 
 (emphasis added). We reasoned that "[t]he statutory requirement that 'reunification shall remain' a plan presupposes the existence of a prior concurrent plan which included reunification."
 

 Id.
 

 As such, this Court held, a trial court is only at liberty to remove reunification from
 
 *463
 
 the concurrent plan during
 
 subsequent
 
 permanency planning hearings.
 

 Id.
 

 The holding in
 
 In re C.P.
 
 requires us to hold in this case that the trial court erred in removing reunification as a concurrent plan following the first and only permanency planning hearing on 8 September 2017.
 

 In re C.P.
 
 went on to hold that, notwithstanding the obligation to include reunification as an initial concurrent plan, Section 7B-906.2(b) allows the trial court to cease reunification efforts during an initial permanency planning hearing.
 

 Id.
 

 A year before
 
 In re C.P.
 
 was decided, this Court held in
 
 In re H.L.
 
 that a trial "court was permitted to [cease reunification efforts] even though [the hearing] was the first permanency planning hearing in [that] case." --- N.C. App. ----, ----,
 
 807 S.E.2d 685
 
 , 693 (2017). In
 
 In re C.P.
 
 we explained that, contrary to
 
 In re H.L.
 
 's holding, such action by the trial court conflicts with N.C. Gen. Stat. § 7B-906.1(g), which provides:
 

 At the conclusion of each permanency planning hearing, the judge shall make specific findings as to the best permanent plans to achieve a safe, permanent home for the juvenile within a reasonable period of time.
 
 The judge shall inform
 
 the parent, guardian, or custodian that failure or refusal to cooperate with the plan
 
 may result
 
 in an order of the court in a subsequent permanency planning hearing that reunification efforts may cease.
 

 N.C. Gen. Stat. § 7B-906.1(g) (2017) (emphasis added);
 
 accord
 

 In re C.P.
 
 , --- N.C. App. at ----,
 
 812 S.E.2d at 191
 
 ("[D]espite the plain language of Section 7B-906.1(g), ... [
 
 In re H.L.
 
 ] held that a trial court can cease reunification efforts at the first permanency planning hearing[.]").
 
 In re C.P.
 
 reasoned that this provision "required prior notice to be provided to a parent before reunification efforts may be ceased;" so that the trial court was prohibited from ceasing reunification efforts in that case. However, because "case law require[d] us to follow"
 
 In re H.L.
 
 , we affirmed the trial court's ceasing of reunification efforts, as it made the appropriate findings required by Section 7B-906.2(b) that such efforts would have adversely affected the juvenile's health or safety.
 
 In re C.P.
 
 , --- N.C. App. at ----,
 
 812 S.E.2d at 191
 
 , 191 n.3 (citing
 
 In re Civil Penalty
 
 ,
 
 324 N.C. 373
 
 , 384,
 
 379 S.E.2d 30
 
 , 37 (1989) ).
 

 The trial court in
 
 In re C.P.
 
 conducted its adjudicatory, initial disposition, and initial permanency planning hearings simultaneously; by contrast, in this case, the trial court staggered the hearings over a period of months.
 

 Id.
 

 at ----,
 
 812 S.E.2d at 190
 
 . But
 
 In re C.P.
 
 's broad holding that "reunification
 
 must
 
 be part of an
 
 initial
 
 permanent plan" is not limited
 
 *464
 
 by its other procedural circumstances.
 

 Id.
 

 (emphasis added). Because we cannot distinguish
 
 In re C.P.
 
 's holding, and in particular its interpretation of Section 7B-906.2(b), we are bound to follow it.
 
 In re Civil Penalty
 
 ,
 
 324 N.C. at 384
 
 ,
 
 379 S.E.2d at 37
 
 .
 

 In that neither this Court nor our Supreme Court has cited to, followed, or analyzed the holding of
 
 In re C.P.
 
 , we note our reservations concerning that decision's interpretation of Section 7B-906.2(b). There are two statutory provisions in Chapter 7B that seem to contradict this Court's interpretation of Section 7B-906.2(b). First, N.C. Gen. Stat. § 7B-906.2(c) provides:
 

 At the first permanency planning
 
 hearing held pursuant to [N.C. Gen. Stat. §] 7B-906.1, the court shall make a finding about whether the efforts of the county department of social services toward reunification
 
 *504
 
 were reasonable,
 
 unless reunification efforts were ceased in accordance with
 
 [N.C. Gen. Stat. §] 7B-901(c) or
 
 this section
 
 .
 

 N.C. Gen. Stat. § 7B-906.2(c) (2017) (emphasis added). Although
 
 In re H.L.
 
 quoted subdivision (c) to support its holding that reunification efforts could be ceased initially,
 
 In re C.P.
 
 did not discuss this analysis, instead reasoning that
 
 In re H.L.
 
 only misapplied a notice requirement in Section 7B-906.1(g).
 
 See
 

 In re C.P.
 
 , --- N.C. App. at ----,
 
 812 S.E.2d at
 
 191 n.3 ("Respectfully, it appears that our Court in
 
 H.L.
 
 did not focus on Section 7B-906.1(g) in its entirety. The second sentence of that section requires prior notice be provided to a parent before reunification efforts may be ceased."). Second, Chapter 7B provides:
 

 At each hearing
 
 , the court shall consider .... Whether efforts to reunite the juvenile with either parent clearly would be unsuccessful or inconsistent with the juvenile's health or safety .... If the court determines efforts would be unsuccessful or inconsistent, the court shall schedule a permanency planning hearing within 30 days to address the permanent plans in accordance with this section and [N.C. Gen. Stat. §] 7B-906.2,
 
 unless the determination is made at a permanency planning hearing
 
 .
 

 N.C. Gen. Stat. § 7B-906.1(d)(3) (2017) (emphasis added). Section 7B-906.1(d)(3) does not constrain ceasing reunification efforts to subsequent permanency planning hearings, but rather seems to allow reunification efforts to be ceased before, after, and even during the first permanency planning hearing. These statutes cannot be read in isolation. Sections 7B-906.2(c) and 7B-906.1(d)(3), when considered together,
 
 *465
 
 seem to provide-consistent with our reading of Section 7B-906.2(b) -that reunification can be eliminated as a primary or secondary plan at the first permanency planning hearing, so long as the trial court makes the required statutory findings.
 

 In re C.P.
 
 's assertion that reunification is a precondition to the trial court's first permanent plan also brings about anomalous results and consequences that raise more questions than answers going forward. For instance, if a trial court were to order reunification initially, but correctly conclude reunification efforts should cease, it still must "order the county department of social services to make efforts toward finalizing the primary and secondary permanent plans." N.C. Gen. Stat. § 7B-906.2(b). We are unable to identify what "efforts" social services must perform when reunification efforts have been ceased but reunification is still included in a permanent plan. A trial court order for a department of social services to cease reunification efforts seems implicitly to eliminate reunification as a permanent plan and vice versa. This example can also be applied to
 
 In re H.L.
 
 In that case the trial court ordered a secondary plan of reunification while also ceasing reunification efforts.
 
 See
 
 --- N.C. App. at ----,
 
 807 S.E.2d at 687
 
 ("[T]he court also ... established a secondary permanent plan of reunification."). The issue of whether reunification must be included in the initial concurrent plan was not raised on appeal in
 
 In re H.L.
 

 Section 7B-1001(a)(5) also provides that a parent can appeal a final "order entered under [ Section] 7B-906.2(b)," obligating the Court of Appeals to "review the order
 
 eliminating reunification as a permanent plan
 
 ." N.C. Gen. Stat. § 7B-1001(a)(5) a. (2017) (emphasis added). If a trial court ceases reunification efforts, but includes reunification as a permanent plan, by the express language of Section 7B-1001(a)(5), an aggrieved parent does not have the statutory right to appeal that order.
 

 Lastly,
 
 In re C.P.
 
 creates a dichotomy between "reunification" and "reunification efforts." One could reasonably construe both terms as being a unitary concept-
 
 i.e.
 
 , being mutually inclusive. This Court has alluded to this interpretation.
 
 See
 

 In re A.P.W.
 
 ,
 
 225 N.C. App. 534
 
 , 537,
 
 741 S.E.2d 388
 
 , 390 (2013) (agreeing with respondent-mother that "the order, while not explicitly ceasing reunification efforts, implicitly did so by changing the permanent plan to adoption and ordering the filing of a petition to terminate parental rights");
 
 see also
 

 In re J.N.S.
 
 ,
 
 207 N.C. App. 670
 
 , 680,
 
 704 S.E.2d 511
 
 , 518 (2010) ("Although the trial court failed to make any findings regarding reasonable efforts at reunification
 
 *505
 
 ... the trial court effectively determined that reunification efforts ... should
 
 *466
 
 cease when it ordered DSS to file a petition to terminate respondent mother's parental rights.").
 

 To avoid confusion of our DSS workers and trial courts and to promote permanency for children in these cases, we encourage the North Carolina General Assembly to amend these statutes to clarify their limitations.
 

 Because
 
 In re C.P.
 
 and
 
 In re H.L.
 
 direct that a trial court can cease reunification efforts during the initial permanency planning hearing, we review Mother's arguments that the trial court here made insufficient findings to support its ruling that reunification efforts should cease.
 
 See
 

 In re T.W.
 
 , --- N.C. App. ----, ----,
 
 796 S.E.2d 792
 
 , 796 (2016) ("[I]f reunification efforts are not foreclosed ... pursuant to N.C. Gen. Stat. § 7B-901(c), the court may eliminate reunification as a goal of the permanent plan
 
 only
 
 upon a finding made under N.C. Gen. Stat. § 7B-906.2(b)." (emphasis in original)). "This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition."
 
 In re C.M.
 
 ,
 
 183 N.C. App. 207
 
 , 213,
 
 644 S.E.2d 588
 
 , 594 (2007).
 

 When relying on Section 7B-906.2(b) for ceasing reunification efforts, the trial court must "demonstrate lack of success" regarding each of the following:
 

 (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
 

 (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
 

 (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
 

 (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.
 

 N.C. Gen. Stat. § 7B-906.2(d) (2017) ;
 
 see
 

 In re D.A.
 
 , --- N.C. App. ----, ----,
 
 811 S.E.2d 729
 
 , 734 (2018) (providing that the trial court must establish the four factors in Section 7B-906.2(d) when ceasing reunification efforts under Section 7B-906.2(b) ). In its permanency planning order, the trial court mirrored the statutory language and provided:
 

 *467
 
 [Mother] and [Father] are not making adequate progress within a reasonable period of time under the plan. [Mother] and [Father] are not actively participating in or cooperating with the plan, [FDSS], and the guardian ad litem for [Megan]. [Mother] and [Father] are not available to the Court, [FDSS], and the guardian ad litem for [Megan]. [Mother] and [Father] are acting in a manner inconsistent with the health or safety of the juvenile.
 

 The trial court subsequently found and concluded that "[e]fforts towards reunification of [Megan] with [Mother] ... should cease," concluded that a "permanent plan of adoption with a concurrent plan of guardianship" was in Megan's best interest, and ordered that reunification not be included in Megan's permanent plan.
 

 Mother contends that some of the trial court's findings conflict with one another and therefore the order must be reversed and remanded to clarify that discrepancy. In finding of fact 30, the trial court found that "[t]here is a
 
 slim likelihood
 
 of reunification with [Mother] within the next six months as [she]
 
 may have completed
 
 some of the court ordered requirements in [Virginia]," but "has failed to provide verification of this to date." (emphasis added). But finding of fact 33 determined that "[Mother is]
 
 not making adequate progress
 
 within a reasonable period of time under the plan." (emphasis added).
 

 "At any permanency planning hearing where the juvenile is not placed with a parent," the trial court must make written findings of fact pertaining to, among other things, "[w]hether it is possible for the juvenile to be placed with a parent within the next six months and, if not, why such placement is not in the juvenile's best interests." N.C. Gen. Stat. § 7B-906.1(e)(1) (2017). Despite Mother's argument that there is discrepancy between findings of fact 30 and 33,
 
 *506
 
 the trial court was merely performing its statutory mandate in determining the likelihood of reunification between Megan and Mother in the following months. The trial court succinctly concluded that, though Mother may have made some efforts to comply with court-ordered conditions, she failed to verify their completion and, partly because of that, Mother was not making adequate progress. Because partially performing a required condition does not necessarily preclude a conclusion that the performance is inadequate, the findings are not contradictory.
 

 Mother next argues that there was no evidence supporting the trial court's finding that she was "acting in a manner inconsistent with the health or safety of [Megan]" because the "court-ordered requirements[,]
 

 *468
 
 which [Mother] did not follow," did not affect Megan's health and safety. We disagree. The record includes an abundance of evidence to support the trial court's finding, including: Mother (1) never verified participating in any substance abuse assessment; (2) failed to verify her living arrangements with FDSS; (3) failed to comply with the family services agreement; (4) allowed Father to supervise one of her other two children and to reside in her residence in violation of the safety plan; (5) sporadically, at best, adhered to the visitation schedule; (6) refused frequent requests to perform the necessary drug screens, and tested positive for drugs; (7) failed to verify her employment with her uncle's real estate business-including hours worked, salary, and title; and (8) never participated in Megan's mandatory medical appointments relating to the abnormalities she had upon her birth. Mother's actions need only be "inconsistent" with Megan's health or safety; her continued recalcitrance to the trial court and her responsibilities satisfy this statutory requirement.
 

 Mother finally argues that the "trial court failed to make the ultimate finding required under Section 7B-906.2(b) 'that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.' " Although the trial court did not use the precise statutory language from Section 7B-906.2(b), our Supreme Court has held:
 

 While trial courts are advised that use of the actual statutory language would be the best practice, the statute does not demand a verbatim recitation of its language .... The trial court's written findings must address the statute's concerns, but need not quote its exact language. On the other hand, use of the precise statutory language will not remedy a lack of supporting evidence for the trial court's order.
 

 In re L.M.T.
 
 ,
 
 367 N.C. 165
 
 , 167-68,
 
 752 S.E.2d 453
 
 , 455 (2013). On appellate review, we need only "consider whether the trial court's findings of fact address the
 
 substance
 
 of the statutory requirements."
 
 Id.
 
 at 165,
 
 752 S.E.2d at 454
 
 ,
 
 367 N.C. 165
 
 (emphasis added).
 

 Despite Mother's contention, the trial court here made the requisite findings "address[ing] the statute's concerns,"
 

 id.
 

 at 168
 
 ,
 
 752 S.E.2d at 455
 
 ,
 
 367 N.C. 165
 
 , that reunification efforts would be unsuccessful or inconsistent with Megan's well-being. Throughout proceedings following Megan's removal from her custody, Mother regularly avoided her court-ordered responsibilities and continuously showed little desire to reunite with Megan. While some of the findings, as argued by Mother, could indeed
 
 *469
 
 "suggest that further efforts toward reunification would not be unsuccessful or inconsistent," (emphasis omitted), we cannot conclude that the trial court's "ruling [was] so arbitrary that it could not have been the result of a reasoned decision."
 
 In re N.G.
 
 ,
 
 186 N.C. App. 1
 
 , 11,
 
 650 S.E.2d 45
 
 , 51 (2007).
 

 Even assuming that the trial court's permanency planning order failed to adequately establish that reunification efforts should cease, contrary to Mother's argument, its termination order provides supplemental findings that support the trial court's order ceasing reunification efforts.
 
 See
 

 In re L.M.T.
 
 ,
 
 367 N.C. at 170
 
 ,
 
 752 S.E.2d at 456-57
 
 ("[I]f a termination of parental rights order is entered, the appeal of the cease reunification order is combined with the appeal of the termination order. ... Because we consider both orders 'together,' incomplete findings of fact in the cease reunification order may be
 
 *507
 
 cured by findings of fact in the termination order.");
 
 cf.
 

 In re A.E.C.
 
 ,
 
 239 N.C. App. 36
 
 , 45,
 
 768 S.E.2d 166
 
 , 172 (2015) ("We hold that the termination order, taken together with the earlier orders, does not contain sufficient findings of fact to cure the defects in the earlier orders."). The trial court found that Mother (1) never communicated nor verified with FDSS her exact address or employment status while residing in Virginia; (2) was residing in motels in Virginia since June 2017 and "had no place to live;" (3) other than three payments, did not pay for any medical care for Megan; and (4) stated in open court during the termination hearing that "she can not [sic] care for Megan."
 

 III.
 
 CONCLUSION
 

 In sum, we affirm the trial's court order denying Mother's attorney's motion for continuance because it did not violate her constitutional right to effective assistance of counsel. We vacate the trial court's initial concurrent permanent plan for failure to include reunification as either a primary or secondary plan and its order terminating Mother's parental rights,
 
 see
 

 In re J.T.
 
 , --- N.C. App. ----, ----,
 
 796 S.E.2d 534
 
 , 537 (2017) (vacating both permanency planning order and order terminating parental rights for failure to properly cease reunification efforts), but affirm the trial court's order ceasing reunification efforts, and remand for further proceedings consistent with this opinion.
 

 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 

 Judges STROUD and ZACHARY concur.
 

 [1]
 

 To preserve anonymity, we use the above pseudonym to refer to the juvenile. Respondent-father ("Father") is not a party to this appeal nor was he involved in any of the trial court proceedings.
 

 [2]
 

 Documents in the record and the trial court referred to this same person as Mother's "father" at times and as her uncle at other times. Because Mother in her briefs refers to him as her uncle, we refer to him as such.
 

 [3]
 

 The record is unclear as to when Mother's attorney last communicated with her prior to the day before the permanency planning hearing. Mother's brief states that the email about her father was sent in early September, but at the September hearing, her attorney stated that the last contact was in July and that "[she] had sent letters to [Mother]" pursuant to the "last address [she] had for her."
 

 [4]
 

 Mother also stated that her two older children's daycare teacher has had "custody" of them, outside of any state social services participation, since December 2017.
 

 [5]
 

 The record includes no testimony or other evidence concerning Mother's father or her time spent caring for her father in Georgia.
 

 [6]
 

 Father's parental rights were terminated as well. He did not appeal.
 

 [7]
 

 In her reply brief, Mother also reasons that her attorney "did not explain to the trial court the specific reasons why she needed more time to prepare, and was not required to do so, as that would have been a violation of her duty of confidentiality." We nonetheless conclude that there was ample communication, time, and knowledge surrounding Mother's case for her attorney to prepare for the termination hearing.
 

 [8]
 

 Section 7B-901(c) "authorizes the elimination of reunification efforts at an initial disposition under limited [statutorily-prescribed] circumstances" when the order puts custody of the juvenile with a department of social services.
 
 In re J.M.
 
 , --- N.C. App. ----, ----,
 
 804 S.E.2d 830
 
 , 840 (2017) (citing N.C. Gen. Stat. § 7B-901(c) ). Because the trial court first ceased reunification efforts at the initial permanency planning hearing, rather than at a dispositional hearing, Section 7B-901(c) does not apply.