IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-491

No. COA21-207

Filed 21 September 2021

Mecklenburg County, Nos. 19 JA 289, 290

IN THE MATTER OF J.R. AND J.C.

Appeal by Respondent-Mother from orders entered 29 December 2020 by Judge David H. Strickland in Mecklenburg County District Court. Heard in the Court of Appeals 24 August 2021.

> *Keith Smith for Petitioner-Appellee Mecklenburg County Youth and Family Services.*
>
> *Parker Poe Adams & Bernstein LLP, by W. Coker Holmes, for Appellee Guardian ad Litem.*
>
> *Freedman Thompson Witt Ceberio & Byrd PLLC, by Christopher M. Watford, for Respondent-Appellant Mother.*

COLLINS, Judge.

¶ 1    Mother appeals from orders awarding guardianship of her sons, James and Justin,[1] to their maternal grandfather and awarding Mother visitation. Mother argues that the trial court erred by concluding that she acted in a manner inconsistent with her constitutionally protected status as a parent, determining that

---

[1] We use pseudonyms for all minors in this opinion to protect their identities. *See* N.C. R. App. P. 42(b).

the guardian understood the legal significance of guardianship, ceasing reunification efforts, and failing to specify the minimum frequency and duration of visits. We affirm in part and remand in part for the trial court to specify the minimum frequency and duration of Mother's visitation.

## I. Procedural History

Petitioner Mecklenburg County Youth and Family Services filed a juvenile petition on 31 July 2019, alleging that James and Justin were neglected and dependent. On 17 October 2019, the trial court entered an order adjudicating James and Justin neglected and dependent and a disposition order. The trial court placed the juveniles with Petitioner, established the primary plan as reunification with the juveniles' parents, and established a secondary plan of guardianship.

The trial court held a permanency planning hearing on 11 December 2020. Following the hearing, the trial court entered a Permanency Planning Hearing Order, a Guardianship Order, and a Guardianship Visitation Order. The orders placed the juveniles in the guardianship of their maternal grandfather, ceased reunification efforts, awarded Mother visitation, and waived further statutory review hearings. Mother timely gave notice of appeal.[2]

---

[2] Both the Permanency Planning Hearing Order and the Guardianship Visitation Order contain the visitation provisions Mother challenges, but Mother's two notices of appeal did not specifically designate the Guardianship Visitation Order as an order from which she

## II.     Factual Background

Mother has had four children:  Justin in 2015, James in 2016, Jackson in 2017, and Mary in 2020.[3]  Mother has a history of child protective service agency involvement with her children beginning in October 2015.  Petitioner referred Mother to services, including domestic violence and mental health services, in October 2015, October 2016, April 2017, January 2018, December 2018, and April 2019.

In July 2019, Jackson was burned, allegedly in a bath, while in the custody of Mother's boyfriend Daquan McFadden.  Mother called a medical hotline to seek treatment advice in lieu of taking Jackson to the doctor because she wanted to avoid further DSS involvement.

On 29 July 2019, Mother and McFadden were staying at a hotel with James, Justin, and Jackson.  Mother left the hotel room from about 8 p.m. to midnight.  When she returned to the hotel room, where McFadden had remained with the children in her absence, she went to sleep.  The next morning, Officer Mike Dashti of the

---

appeals.  *See* N.C. R. App. P. 3(d) (notice of appeal must "designate the judgment or order from which appeal is taken").  However, "[i]t is well established that a mistake in designating the order appealed from should not result in loss of the appeal as long as the intent to appeal from a specific [order] can be *fairly inferred* from the notice and the appellee is not misled by the mistake." *Phelps Staffing, LLC v. S.C. Phelps, Inc.*, 217 N.C. App. 403, 410, 720 S.E.2d 785, 791 (2011) (citation and quotation marks omitted).  Mother's intent to appeal the trial court's award of visitation is clear from her second notice of appeal and there is no indication that either appellee was misled by the mistake.  We will therefore review Mother's challenge to the visitation provisions found in both the Permanency Planning Hearing Order and the Guardianship Visitation Order.

[3] James' and Justin's fathers are not parties to this appeal.

Charlotte Mecklenburg Police Department responded to a 911 call from the hotel room. Dashti arrived and observed Mother on the phone with 911. Dashti found Jackson lying on the bathroom floor unresponsive, with no pulse, and cold to the touch. Dashti observed blood on Jackson's nose and face, a bruise on Jackson's forehead, and a 10-to-12-inch bloodstain on a pillow on one of the beds.

Resuscitation efforts were unsuccessful and Jackson was pronounced dead at the hospital. An autopsy indicated that Jackson had suffered a

> blunt force injury to his head, a large subdural hematoma, a hematoma to his liver, facial abrasions and head contusions on his forehead and lip area, a bite mark on his left shoulder, and lesions healing on his scrotum and buttocks.

The autopsy concluded that Jackson's manner of death was homicide, caused by "an acute blunt force trauma injury[.]"

Mother was charged with felony child abuse; McFadden was charged with Jackson's murder. The State dismissed the criminal charge against Mother on 31 August 2020.

Petitioner filed the juvenile petition on 31 July 2019, alleging that James and Justin were neglected and dependent, and the trial court awarded Petitioner nonsecure custody. Petitioner initially placed James and Justin in a home where both their fathers lived. On 17 October 2019, the trial court adjudicated James and Justin neglected and dependent and entered a disposition order. The trial court

maintained the juveniles in Petitioner's custody and established the primary plan as reunification with the juveniles' parents, with a secondary plan of guardianship. In December 2019, Petitioner placed James and Justin with their maternal grandfather after allegations that James' father hit Justin.

¶ 10        Prior to the adjudication hearing, Petitioner prepared a proposed Family Services Agreement ("case plan") for Mother. The trial court adopted this case plan in its adjudication order. The case plan required Mother to, inter alia, (1) complete a "F.I.R.S.T." assessment;[4] (2) "comply with mental health treatment, [] follow all therapeutic recommendations[,]" and take any necessary medication as prescribed; (3) complete parenting classes; (4) obtain employment to meet the juveniles' basic needs; and (5) "maintain an appropriate, safe, and stable living environment for herself and her children[.]"

¶ 11        The trial court held a permanency planning hearing on 11 December 2020. Following the hearing, the trial court entered a Permanency Planning Hearing Order, a Guardianship Order, and a Guardianship Visitation Order. In the Permanency Planning Hearing Order, the trial court made the following findings of fact regarding Mother's progress on her case plan:

> 16. The mother is employed at Wal-Mart but has reduced her hours from 30 to 20 because of her SSI. She receives approximately $790 per month in SSI. The mother

---

[4] The record does not include a definition of this acronym.

completed parenting classes . . . on June 30, 2020. The mother is living with a family friend and paying rent. She has her own room with a queen bed and room for her and her baby [Mary] . . . . It is not appropriate for these two juveniles as it is not big enough. The mother had a F.I.R.S.T. assessment on April 23, 2020. The mother was recommended to undergo an assessment and drug screen at Anuvia; however, she refused and hung up on the F.I.R.S.T. program staff. The drug screen is a part of the screening process with F.I.R.S.T. The mother was referred to Family First for a substance abuse assessment on at least three separate occasions (5/15/2020, 9/24/2020, and 10/29/2020). On all three occasions, she refused treatment. She did follow through with being assessed during the last referral on November 13, 2020 and was recommended to receive both Outpatient Therapy at a frequency of two times per week and Trauma Therapy; however, the mother informed . . . the assessing clinician, that she did not believe in therapy and did not want to engage. The mother has been discharged twice from Family First and is subject to be discharged on December 14, 2020 if she does not respond. She has also not signed her Person-Centered Plan which needs to be signed before the treatment services can begin. A referral was made to Thrive for a mental health assessment. The mother has not done a mental health assessment at this time. The mother has consistently maintained with professionals that she did not think therapy was appropriate for her. The mother has also not engaged in domestic violence services at this time.

. . . .

21.f.    Despite recommendations, the mother has consistently stated she will not take part in mental health services despite concerns on her behavior, temper, and grief of loss of her child.

21.h.   Mother does not have housing that can meet the needs of these juveniles.

21.i. She is renting a room from a friend that has a Queen bed and pack and play for [Mary].

. . . .

21.k. [Mother's] criminal case was dismissed on August 31, 2020 and since then minimal progress was made by the mother on her case plan.

21.l. The court does not have confidence that the mother will follow through with the items of the case plan. While the court understands she was not able to do certain things on her plan due to pending criminal charges, her many other actions and statements indicate she will not follow through with the services.

. . . .

22.b. The mother is not making adequate progress within a reasonable time under the plan.

. . . .

22.i. The mother is acting in a manner inconsistent with the health or safety of the juveniles.

¶ 12        The trial court concluded that Mother had "acted in a manner inconsistent with [her] constitutionally protected rights as a parent." The trial court also found that further reunification efforts "clearly would be unsuccessful or would be inconsistent with the juveniles' health and safety and need for a safe, permanent home within a reasonable period of time." The trial court determined that the maternal grandfather was "ready and able to accept the guardianship of the juveniles," "under[stood] the legal significance of the appointment and has adequate resources to care

appropriately for the juveniles." The trial court therefore ceased reunification efforts and appointed the maternal grandfather the guardian of the juveniles.

¶ 13   In the Permanency Planning Hearing Order and Guardianship Visitation Order, the trial court awarded Mother multiple forms of visitation. The trial court awarded Mother "regular visitation" as follows:

> [Mother] shall have supervised visitation with the minor children to occur a minimum of four hours per month. The visits are to be supervised by [the maternal grandfather] or an approved responsible adult. The day and time of each visit will be agreed upon between [Mother and the maternal grandfather].

Mother appeals.

### III.   Discussion

### A. Award of Guardianship

¶ 14   Mother challenges the Permanency Planning Hearing Order's award of guardianship of the juveniles to their maternal grandfather. "This Court's review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law." *In re P.O.*, 207 N.C. App. 35, 41, 698 S.E.2d 525, 530 (2010) (citation omitted). Unchallenged findings of fact are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). We review de novo the conclusion of law that a parent acted in a manner inconsistent with the constitutionally protected status of a parent. *In re D.A.*, 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018).

### 1. *Actions Inconsistent with Mother's Constitutionally Protected Status as a Parent*

¶ 15    Mother first argues that the trial court erred by concluding that she acted in a manner inconsistent with her constitutionally protected status as a parent. Specifically, Mother contends that actions inconsistent with the constitutionally protected status of a parent must be "willful, volitional actions of the parent." Mother argues that findings in the trial court's Permanency Planning Hearing Order are therefore deficient because they do not address whether her cognitive "limitations affected her allegedly inconsistent conduct or whether [she] could even appreciate the consequences of her conduct such that she could intentionally and willfully engage in conduct that is truly inconsistent with that of a parent."

¶ 16    At a permanency planning hearing, the court may set guardianship as the juvenile's permanent plan and appoint a guardian for the juvenile if the court finds that doing so is in the juvenile's best interests. N.C. Gen. Stat. §§ 7B-906.2(a)(3) (2020); 7B-600(a) (2020). However, a natural parent has a "constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child[.]" *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997) (citations omitted). This constitutionally protected interest "is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child." *Id.* "Prior to granting guardianship of a

child to a nonparent, a district court must clearly address whether [the] respondent is unfit as a parent or if [her] conduct has been inconsistent with [her] constitutionally protected status as a parent[.]" *In re R.P.*, 252 N.C. App. 301, 304, 798 S.E.2d 428, 430 (2017) (quotation marks and citation omitted).[5]

¶ 17    In support of her argument that the trial court was required to find that her conduct was willful and intentional, Mother cites *In re A.L.L.*, 376 N.C. 99, 852 S.E.2d 1 (2020). *In re A.L.L.* is inapposite, however, because it concerned the termination of parental rights under N.C. Gen. Stat. § 7B-1111(a)(7), not the appointment of a guardian under sections 7B-600(a) and 7B-906.2(a)(3). *See In re A.L.L.*, 376 N.C. at 110-11, 852 S.E.2d at 9. Unlike the statutes at issue in the present case, section 7B-1111(a)(7) expressly requires "willful" abandonment of a juvenile or "voluntary" abandonment of an infant. N.C. Gen. Stat. § 7B-1111(a)(7) (2020).

¶ 18    Mother also cites *Rodriguez v. Rodriguez*, 211 N.C. App. 267, 710 S.E.2d 235 (2011), but *Rodriguez* is likewise inapposite. In *Rodriguez*, the paternal grandparents sued the natural mother for custody under Chapter 50 and the trial court awarded visitation. *Id.* at 269, 710 S.E.2d at 237-38. We held that the trial court erred by concluding that the mother had acted inconsistently with her

---

[5] While this analysis is often applied in civil custody cases under Chapter 50 of the North Carolina General Statutes, it also applies to custody awards arising out of juvenile petitions filed under Chapter 7B. *In re D.M.*, 211 N.C. App. 382, 385, 712 S.E.2d 355, 357 (2011).

constitutionally protected status as a parent because the juveniles had previously been adjudicated dependent, but not abused or neglected, and there were no additional findings of fact sufficient to show that the mother had acted inconsistently with her status as a parent. *Id.* at 279, 710 S.E.2d at 243.

¶ 19        Here, by contrast, the trial court adjudicated James and Justin neglected and dependent, and Mother does not challenge this adjudication. Neglect "clearly constitute[s] conduct inconsistent with the protected status parents may enjoy." *Price*, 346 N.C. at 79, 484 S.E.2d at 534. The neglect adjudication was premised on a finding that the juveniles lived "in an environment injurious to their welfare because they were exposed to the homicide of their brother, [Jackson], and live[d] in the home where their brother died as a result of abuse." The trial court further found that Mother had previously called a medical hotline for advice on treating a burn on Jackson "instead of taking the child to the doctor because she did not want another DSS case."

¶ 20        Moreover, following the permanency planning hearing, the trial court found that Mother had failed to comply with multiple aspects of her case plan. Specifically, the trial court found that Mother's housing was insufficient for James and Justin because it was too small; Mother repeatedly refused to engage in therapy and other assessments; Mother indicated that she "did not believe in therapy and did not want to engage"; and Mother did not engage in domestic violence services.

¶ 21        Mother argues that "[t]he evidence does not support the finding that [Mother] is not actively participating in and cooperating with the plan because so much of the plan bears no logical nexus to the reasons why James and Justin came into custody." This argument is foreclosed by Mother's failure to challenge the trial court's adjudication order wherein the trial court specifically found that the case plan was "in the [children's] best interests and appropriate to address the issues that led to the [children's] placement[.]" This unchallenged finding of fact is binding on appeal. *Koufman,* 330 N.C. at 97, 408 S.E.2d at 731.

¶ 22        Together, the trial court's findings of fact support the conclusion of law that Mother had acted in a manner inconsistent with her constitutionally protected status as a parent. The trial court did not err by applying the best interest of the juvenile standard and awarding guardianship.

## 2. *Verification under N.C. Gen. Stat. §§ 7B-600(c) and 7B-906.1(j)*

¶ 23        Mother also argues that the trial court erred by concluding that the maternal grandfather understood the legal significance of guardianship as required by N.C. Gen. Stat. §§ 7B-600(c) and 7B-906.1(j).

¶ 24        Prior to appointing a guardian under Chapter 7B, "the court shall verify that the person being appointed as guardian of the juvenile understands the legal significance of the appointment and will have adequate resources to care appropriately for the juvenile." N.C. Gen. Stat. § 7B-600(c) (2020); *see also* N.C. Gen.

Stat. § 7B-906.1(j) (2020) (same). "The Juvenile Code does not require that the court make any specific findings in order to make the verification. It is sufficient that the court receives and considers evidence that the guardians understand the legal significance of the guardianship." *In re L.M.*, 238 N.C. App. 345, 347, 767 S.E.2d 430, 432 (2014) (quotation marks and citations omitted). At a permanency planning hearing "[t]he court may consider any evidence, including hearsay evidence . . . that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen. Stat. § 7B-906.1(c). This evidence may include reports and home studies conducted by the guardian ad litem or department of social services. *See In re J.E., B.E.*, 182 N.C. App. 612, 617, 643 S.E.2d 70, 73 (2007) (trial court which received and considered department of social services home study reports complied with section 7B-600).

¶ 25    The trial court conducted the following colloquy with the maternal grandfather at the permanency planning hearing:

> THE COURT: Mr. Steele, do you understand that, if I appoint you the guardian of these two children that, first and foremost, you would be the one mainly financially responsible for them? That's on you.
>
> MR. STEELE: Right.
>
> THE COURT: Do you understand that?
>
> MR. STEELE: Yes.
>
> THE COURT: All right. And you understand that, if I

appint you the guardian, that you would have the care, custody, and control of the juvenile[s] and may arrange for a suitable placement for the juvenile[s]? Do you understand that?

MR. STEELE: A suitable placement?

THE COURT: Yes, sir.

MR. STEELE: What do you mean by that?

THE COURT: That means that you would be responsible for providing any type of placement for them.

MR. STEELE: Yes.

THE COURT: Okay. And that you may also represent the juvenile[s] in legal actions before any court. Do you understand that?

MR. STEELE: Yes.

THE COURT: Do you understand that you may consent to certain actions on the part of the juvenile[s] in place of the parent, including marriage, enlisting in the armed forces of the United States, and enrolling in school?

MR. STEELE: Yes.

THE COURT: Do you also understand that, if I appoint you the guardian, that you may consent to any necessary remedial, psychological, medical, or surgical treatment for the juvenile[s]?

MR. STEELE: Yes.

¶ 26 Social worker Cawan Jenkins also testified that the maternal grandfather "underst[ood] what guardianship would entail[.]" Moreover, Jenkins' court summaries, the guardian ad litem's two reports, and the maternal grandfather's

testimony reflect that James and Justin had lived with the maternal grandfather for approximately one year. During that time, the maternal grandfather took the juveniles to medical and therapy appointments, ensured their visitation with their parents, and financially provided for the juveniles.

¶ 27     Finally, the maternal grandfather testified as follows on direct examination:

> Q. You're aware that [Petitioner] is recommending that the Court grant you guardianship of the juveniles today?
>
> A. Yes.
>
> . . . .
>
> Q. What is your understanding of the legal significance of the appointment of guardianship?
>
> A. I mean . . . I think that word speaks for itself, "guardianship." I got to be there for them. It's no off day. It's no off day. I've got to be there for them. Like they're just kids. They're little boys, so it's all on me. I mean I hope I'm wording this right, but it's all on me to walk them through the steps. . . .
>
> It's all on me to walk them through the steps, hold their hand, and you know, try and get them by this, past this. Make sure their appointments are there. Consistently make sure they have a place to stay, you know, like they have been. It's a lot of stuff with it, and there's no day off. There's no day off.

¶ 28     The trial court's colloquy with the maternal grandfather, the maternal grandfather's testimony, and the evidence submitted by the social worker and guardian ad litem was competent evidence in support of the trial court's conclusion

that the maternal grandfather "understands the legal significance of the appointment and will have adequate resources to care appropriately for the juvenile[s]." The trial court did not err in making the verification required by sections 7B-600(c) and 7B-906.1(j).

## B. Cessation of Reunification Efforts

¶ 29      Mother argues that the trial court erred by ceasing reunification efforts because the record does not show that such efforts clearly would be unsuccessful or inconsistent with the juveniles' health or safety.

¶ 30      "This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re M.T.-L.Y.*, 265 N.C. App. 454, 466, 829 S.E.2d 496, 505 (2019) (citation omitted).

¶ 31      At any permanency planning hearing, the trial court may cease reunification efforts upon making "written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b). To determine whether reunification efforts "clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety," the trial court must make written findings concerning:

(1) Whether the parent is making adequate progress within a reasonable period of time under the plan.

(2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.

(3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.

(4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d); *In re D.C.*, 275 N.C. App. 26, 29, 852 S.E.2d 694, 697 (2020).

Here, the trial court found that reunification efforts with Mother "clearly would be unsuccessful or would be inconsistent with the juveniles' health and safety and need for a safe, permanent home within a reasonable period of time." The trial court also made the following findings, as required by section 7B-906.2(d):

22.b. The mother is not making adequate progress within a reasonable time under the plan.

. . . .

22.e. The mother is not actively participating in and cooperating with the plan, YFS and the guardian *ad litem* for the juveniles.

. . . .

22.g. The mother . . . [has] remained available to the Court, YFS, and [the] guardian *ad litem* for the juveniles.

. . . .

> 22.i. The mother is acting in a manner inconsistent with the health or safety of the juveniles.

Mother acknowledges that these findings comply with section 7B-906.2(d), but argues that they are unsupported or contradicted by evidence in the record. We disagree.

¶ 33    Credible evidence in the record supports the findings that Mother was not making adequate progress within a reasonable time under her case plan and was not actively participating in and cooperating with the plan, Petitioner, and the guardian ad litem. A court summary prepared by social worker Jenkins and admitted into evidence indicated that Mother refused to complete recommended mental health assessments and drug screenings on multiple occasions. The trial court also admitted into evidence a letter from a Family First Program Manager stating that

> [Mother] was referred to Family First on at least 3 separate occasions: 5/15/20, 9/24/20 and 10/29/20. On all three occasions, [Mother] refused treatment. She did follow through with being assessed during the last referral on 11/13/20 and was recommended to receive both OPT at a frequency of 2x per week and Trauma Therapy; however, [Mother] informed [the] assessing clinician, that she did not believe in therapy and did not want to engage. Please note that [Mother] was discharged twice and currently her case is still open and subject to be discharged on 12/14/20 if she does not respond. She also has yet to sign her Person-Centered Plan (PCP) which needs to be signed by [Mother] and service order approved before treatment services can begin.

¶ 34    Jenkins' summary also reflected that Mother had not engaged in domestic violence services despite a history of domestic violence with child protective service

involvement. At the permanency planning hearing, Jenkins testified that Mother failed to follow through with the recommendations of the assessments she did complete, "which include[d] substance abuse services, outpatient services as well as a mental health assessment." The guardian ad litem's two reports, which were also admitted into evidence, reflect that Mother had "outbursts of anger and yelling" towards the social worker supervising her video visitation with the juveniles in July 2020; Mother had "not sought Mental health services to assess her needs"; and "[w]ith further explanation, [Mother] seemed to understand how therapy or counseling may help her be her best for herself and her children, but in the next conversation, she would again argue the need for it." Mother suggests that her cooperation with the case plan was hindered by her pending criminal charge, but does not challenge the trial court's finding that she made minimal progress on her case plan even after the charge was dismissed on 31 August 2021.

¶ 35        Credible evidence also supports the finding that Mother was "acting in a manner inconsistent with the health or safety of the juveniles." The trial court found that James and Justin were previously adjudicated neglected and dependent based on the circumstances of Jackson's death, James and Justin's exposure to Jackson's death, and Mother's decision not to seek medical treatment for Jackson's burns to avoid further DSS involvement. Mother also failed to secure appropriate housing for James and Justin to live with her. Specifically, the social worker testified that the

room where Mother was staying was not appropriate for James and Justin to join her because there was not enough space.

¶ 36    Mother contends that her continued custody of Mary contradicts the trial court's finding that she was acting in a manner inconsistent with the juveniles' health or safety. The trial court had discretion to weigh this evidence, *In re T.H.*, 266 N.C. App. 41, 45, 832 S.E.2d 162, 165 (2019), and could consider it in light of the active child protective service involvement with Mary at the time of the permanency planning hearing and evidence that Mother asks her father to babysit Mary "for days at a time."

¶ 37    The trial court's finding that further reunification efforts clearly would be unsuccessful or would be inconsistent with the juveniles' health or safety was supported by credible evidence in the record, and these findings support the trial court's cessation of reunification efforts.

## C. Visitation Order

¶ 38    Lastly, Mother argues that the trial court violated N.C. Gen. Stat. § 7B-905.1(c) by failing to specify the minimum frequency and duration of her visits with James and Justin.

¶ 39    "This Court reviews the trial court's dispositional orders of visitation for an abuse of discretion." *In re C.M.*, 183 N.C. App. 207, 215, 644 S.E.2d 588, 595 (2007) (citations omitted). Where the trial court places the juvenile with a guardian, "any

order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised. The court may authorize additional visitation as agreed upon by the respondent and custodian or guardian." N.C. Gen. Stat. § 7B-905.1(c) (2020).

¶ 40        The trial court's Visitation Order provides that Mother

> shall have supervised visitation with the minor children to occur a minimum of four hours per month. The visits are to be supervised by [the maternal grandfather] or an approved responsible adult. The day and time of each visit will be agreed upon between [Mother] and [the maternal grandfather].

¶ 41        This provision can be read to require a minimum of one visit of four hours per month, or it can be read to require multiple visits of shorter duration for a total of four hours per month. Throughout much of the history of the case, Mother's supervised visitation was two hours, twice per month. The Guardian ad Litem recommended supervised visitation twice per month. Petitioner's court report referred to supervised visitation "twice per month for a total of two hours each time." When rendering the order, the trial court stated that it was "going to adopt the visitation plan that was submitted by [Petitioner][,]" which provided for supervised "visitation with the minor children to occur a minimum of four hours per month."

¶ 42        Although the Visitation Order's provision did specify a minimum amount of visitation of 4 hours per month, the provision does not unambiguously articulate the

minimum frequency and length of the visits. Accordingly, we remand for the trial court to set the minimum frequency of the visitation, as required by section 7B-905.1(c).

¶ 43 Mother also argues that the visitation order amounts to an impermissible delegation of judicial authority. We disagree. "While our case law recognizes that some decision-making authority may be ceded to the parties with respect to visitation, it also reveals that an order is less likely to be sustained as judicially-imposed structure decreases and the decision-making party's unfettered discretion increases." *Peters v. Pennington*, 210 N.C. App. 1, 20, 707 S.E.2d 724, 738 (2011). In this case, the trial court did not grant the guardian any unfettered discretion to modify or suspend visitation. Instead, the trial court left only the day and time of each visit to be agreed upon by Mother and the guardian. The trial court did not abuse its discretion by granting this limited degree of flexibility to the parties.

## IV. Conclusion

¶ 44 The trial court's findings of fact supported its conclusion of law that Mother acted inconsistently with her constitutionally protected status, and the trial court appropriately verified the maternal grandfather's understanding of the legal significance of guardianship. Accordingly, the trial court did not err in awarding guardianship of James and Justin to the maternal grandfather. The trial court did not err by ceasing reunification efforts and did not impermissibly delegate judicial

authority in its award of visitation. We remand to the trial court to specify the minimum frequency and duration of visitation as required by section 7B-905.1(c).

AFFIRMED IN PART, REMANDED IN PART.

Chief Judge STROUD and Judge DIETZ concur.