628 S.E.2d 416 (2006)
In the Matter of H.S.F., Minor Child.
No. COA05-1157.
Court of Appeals of North Carolina.
April 18, 2006.
Charles E. Wilson, Jr., Shelby, for petitioner-appellee.
Rebekah W. Davis, Raleigh, for respondent-appellant.
*417 GEER, Judge.
This appeal stems from an order entered by the Cleveland County District Court, following a review hearing, changing primary physical custody of the minor child, H.S.F., from her father to her mother. Because we hold that the trial court's findings of fact do not support its conclusion of law that this change was in the minor child's best interests and because the disposition ordered by the court is not one authorized by statute, we reverse the trial court's order and remand this case for further proceedings.

Factual and Procedural History
The respondent father and H.S.F.'s mother were married on 14 July 1990. H.S.F. was born on 19 January 1993. The parents divorced in 1994 or 1995, and the child's *418 mother later remarried. Subsequent to her parents' separation, the child lived primarily with her mother, but stayed in contact with her father. On 28 January 2004, the Cleveland County Department of Social Services ("DSS") filed a petition pursuant to N.C. Gen.Stat. § 7B-402 (2005). The petition alleged that the child was a neglected juvenile under N.C. Gen.Stat. § 7B-101(15) (2005) because she was living in an environment injurious to her welfare as a result of domestic violence occurring between the mother and her second husband, the child's stepfather.
On 28 January 2004, District Court Judge Larry Wilson signed a non-secure custody order, pursuant to N.C. Gen.Stat. § 7B-504 (2005), on the grounds that the child was exposed to a substantial risk of physical injury under N.C. Gen.Stat. § 7B-503(a)(3) (2005). Pursuant to the seven-day deadline mandated by N.C. Gen.Stat. § 7B-506 (2005), Judge Wilson signed a second order on the need for continued non-secure custody on 6 February 2004. This order continued DSS' non-secure custody over the child and sanctioned continued placement of the child with her father and her paternal grandmother. The order found that (1) the mother and stepfather had refused to cooperate with services offered by DSS, and (2) the couple's failure to comply with domestic violence protective orders, the incidents of domestic violence, and the couple's failure to cooperate with DSS exposed the child to a substantial risk of injury.
On 14 May 2004, District Court Judge Charles A. Horn entered an adjudication and dispositional order, following a four-day hearing that took place at the end of April. The May order found that (1) the mother had been abusing prescription drugs for more than 10 years; (2) loaded weapons were kept in the home in an unsecure location; (3) 99 telephone calls to 911 had been placed from the residence, mostly for the purpose of protecting the mother from the stepfather; (4) the stepfather had inflicted three broken limbs and at least four black eyes on the mother; (5) the mother and the child had planned an escape route for the child, in case she was caught in the middle of an altercation; and (6) the mother and stepfather had consistently rejected all of DSS' attempts to work with the family. Based on these and other findings, the May order terminated DSS' custody, assigned joint legal custody of the child to the mother and father, and placed primary physical custody with the father, "but with the physical placement of the juvenile to be with her paternal grandmother."
Elsewhere in the May order, the mother and the maternal grandfather were given visitation rights, but strict parameters were placed on contact between the child and the stepfather. The order stated that "this matter shall be reviewed, as a peremptory setting, on this Court's Civil Domestic Term on Monday, August 2, 2004." The court specified that "further reunification efforts on the part of [DSS] with the respondent mother and stepfather would clearly be futile, and [DSS] should be relieved of its duty to make such continued efforts." Following the mother's appeal, this Court affirmed the May order. In re H.S.F., ___ N.C.App. ___, 625 S.E.2d 916 (2006) (unpublished).
In June 2004, a month after Judge Horn's initial adjudication and disposition, the mother and father filed cross motions for contempt, each alleging that the other was not in compliance with the May order. At the outset of the August 2004 review hearing provided for in the May order, the trial judge asked why the matter was before him, and counsel for the parties explained that it was coming on for review pursuant to the May order and for resolution of the two cross-motions for contempt. The trial judge said, "So we're here on contempt motions," and the father's counsel said, "Essentially, Your Honor." A few minutes later, however, the trial court stated, "this matter is going to be reviewed as to the status of [the child] only this day.... And we're not going into any into any [sic] contempt hearings at all."
At the hearing, counsel for the mother attempted to tender the child (age 11) as a witness. The guardian ad litem objected. Counsel for the mother then requested that the court clear the room except for counsel, "so that [the child] can feel like she can express what she  whatever she needs to tell us." The trial judge declined to do so, stating *419 instead that he would "take [the child] in chambers alone and discuss the matter with her." The guardian ad litem and the mother's counsel stated that they had no objection. Counsel for the father neither consented nor specifically objected to this procedure.
The trial judge then engaged in a private conference with the child and her guardian ad litem. The exact contents of this conversation have never been disclosed. Afterwards, the court heard testimony from the mother, who was examined by her counsel. Following the mother's testimony, the trial judge said to counsel for the father, "[D]o you wish to call a witness? I know you're shooting in the dark but I'm going to leave you there." When the father's counsel went to call his first witness  the paternal grandmother  to the stand, the trial court, acting sua sponte, refused to hear her testimony, stating, "I do not care to hear from her. I'll hear from your client."
After the father and the maternal grandfather testified, the following exchange occurred:
THE COURT: The custody's getting ready to change because ... I've given [respondent father] now four months to make a situation wherein he could come before this Court and present a situation where he could take this child into his custody.
....
MR. CERWIN [father's counsel]: ... Your Honor, [the father]'s doing what the Court ordered him to do. He has the same home. His home is suitable. He's been wanting that child there since the beginning. It  his residence is suitable for that child.
THE COURT: No, it isn't.
MR. CERWIN: What  what's not suitable about it?
THE COURT: It's a thing called marriage.... I guess I'm old time.
The court then stated, "the big thing [in the custody determination] is a little gal who pretty well opened up to me as we talked." The guardian ad litem, who had been present at the private conference in the judge's chambers, expressed grave concerns about a change in custody, because she did not think that the maternal grandfather could protect both the mother and the child from the stepfather's aggressiveness and violence.
Towards the end of the hearing, when it became apparent that the trial judge was planning to change the child's physical custody back to the mother, counsel for DSS repeated a concern he said he had already stated at the earlier adjudication hearing in April:
[T]he other concerning issue for me ... is... that this Court should be bound by the dispositional alternatives set forth in the Juvenile Code [N.C. Gen.Stat. § 7B-903 (2005)], and I do not believe that the Court has the authority to grant custody to a non-party grandparent in a juvenile court case brought under  under the Juvenile Code.
....
Fault and no fault aside, the father in this case was a non-offending party and should be entitled by law to custody of this child. There have no  been no 50  Chapter 50 actions filed. There have been no findings by the Court under Chapter 50 that he is an unfit parent. And I just  I don't think the Court has the authority....
At that point, the trial judge interrupted him: "I will [have the authority] when I finish up the order, sir.... I'm going to attempt to make it work."
Following the hearing, the trial court filed a written order on 17 September 2004 modifying the May 2004 custody order. The September order provided that the father and mother would continue to share joint legal custody. It further provided, however, that:
the primary physical custody of the juvenile shall be with the respondent mother, [C.B.], but with the physical placement of the juvenile to be with her maternal grandfather, [T.A.], provided that the respondent mother is in the home of [T.A.] all evenings to assist with the minor child's school preparation from the time school lets out to the time [the child] goes to school in the morning.
Respondent father was granted visitation rights every other weekend, and the order *420 also provided that the child could visit with her mother and stepfather at their home for two hours at a time on three separate days of the week. The child's father timely appealed.

I
The respondent father first contends that the district court lacked jurisdiction to review the child's custody and placement. The May order scheduled the August review hearing pursuant to N.C. Gen.Stat. § 7B-906(a) (2005), which provides that a court has a duty to conduct periodic review hearings "[i]n any case where custody is removed from a parent, guardian, custodian, or caretaker." The father, however, points to N.C. Gen.Stat. § 7B-906(d), which provides: "If at any time custody is restored to a parent, guardian, custodian, or caretaker the court shall be relieved of the duty to conduct periodic judicial reviews of the placement." The father argues on appeal that, under § 7B-906(d), once DSS ceased to have custody and he was given physical custody by the May order, the court no longer had jurisdiction to conduct the statutory periodic hearings. This argument has been rejected by our Supreme Court.
In In re Shue, 311 N.C. 586, 319 S.E.2d 567 (1984), the Supreme Court considered the predecessor statute to N.C. Gen.Stat. § 7B-906, which contained essentially identical language to the current statute: "If any time custody is restored to a parent, the court shall be relieved of the duty to conduct periodic judicial reviews of the placement." N.C. Gen.Stat. § 7A-657 (1981). In Shue, the Court stressed that this language meant only that a trial court could terminate its jurisdiction; it was not required to do so: "If custody had been restored to [the mother], the trial court could have, although it was not required to, terminated its jurisdiction over [the child] and this case." 311 N.C. at 600 n. 6, 319 S.E.2d at 576 n. 6.
This Court has previously held, in the context of the Juvenile Code, that "[o]nce the court obtains jurisdiction over a juvenile, that `jurisdiction shall continue until terminated by order of the court or until the juvenile reaches the age of 18 years or is otherwise emancipated....'" In re J.S., 165 N.C.App. 509, 513, 598 S.E.2d 658, 661 (2004) (quoting N.C. Gen.Stat. § 7B-201 (2003)). See also N.C. Gen.Stat. § 7B-1000(b) (2005) ("In any case where the court finds the juvenile to be abused, neglected, or dependent, the jurisdiction of the court to modify any order or disposition made in the case shall continue during the minority of the juvenile, until terminated by order of the court, or until the juvenile is otherwise emancipated."). In this case, prior to the hearing in August, no order had been entered closing the case, and the child had not yet reached age 18. The court, therefore, still had jurisdiction.

II
The respondent father next assigns error to the trial judge's decision to interview the child with her guardian ad litem outside the presence of the parties. He argues that the interview was improper because he never expressly consented to the trial judge's interview of the child in chambers.
Respondent father is correct that "[i]n custody proceedings, the trial court may question a child in open court but the court may question the children privately only with the consent of the parties." Cox v. Cox, 133 N.C.App. 221, 227, 515 S.E.2d 61, 65 (1999). If, however, the parties had an opportunity to object to an in camera interview of a child and did not do so, the interview is said to have been conducted with their "informed acquiescence" and cannot be the basis for an objection on appeal. Stevens v. Stevens, 26 N.C.App. 509, 510-11, 215 S.E.2d 881, 881-82, cert. denied, 288 N.C. 396, 218 S.E.2d 470 (1975).
In the present case, the transcript of the August hearing indicates that the mother and the guardian both consented to the trial judge's interview of the child in chambers, while the father simply remained silent. Under Stevens, the father's silence in the face of an opportunity to object precludes review of this issue on appeal.

III
The final issue to be addressed regarding the September order is its conclusion *421 that it was in the child's best interests to return physical custody to the mother while providing for "physical placement" with the maternal grandfather. We review a trial court's conclusions of law to determine whether they are supported by findings of fact. In re Helms, 127 N.C.App. 505, 511, 491 S.E.2d 672, 676 (1997). Further, we must determine whether the disposition adopted by the trial court is one authorized by statute. In re Burrus, 275 N.C. 517, 535, 169 S.E.2d 879, 891 (1969), aff'd, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).
N.C. Gen.Stat. § 7B-906 governs review by district courts of prior orders entered under the Juvenile Code and was the basis for the trial court's order in this case. That statute provides:
The court, after making findings of fact,... may make any disposition authorized by G.S. 7B-903, including the authority to place the juvenile in the custody of either parent or any relative found by the court to be suitable and found by the court to be in the best interests of the juvenile. The court may enter an order continuing the placement under review or providing for a different placement as is deemed to be in the best interests of the juvenile.
N.C. Gen.Stat. § 7B-906(d). The statute further specifies that "[i]f the court determines that the juvenile shall be placed in the custody of an individual other than the parents..., the court shall verify that the person receiving custody ... understands the legal significance of the placement or appointment and will have adequate resources to care appropriately for the juvenile." N.C. Gen.Stat. § 7B-906(g).
N.C. Gen.Stat. § 7B-903 specifies the "alternatives [that] shall be available to any court exercising jurisdiction" and provides that "the court may combine any of the applicable alternatives when the court finds the disposition to be in the best interests of the juvenile...." The alternatives are limited to the following:
(1) The court may dismiss the case or continue the case in order to allow the parent, guardian, custodian, caretaker or others to take appropriate action.
(2) In the case of any juvenile who needs more adequate care or supervision or who needs placement, the court may:
a. Require that the juvenile be supervised in the juvenile's own home by the department of social services in the juvenile's county, or by other personnel as may be available to the court, subject to conditions applicable to the parent, guardian, custodian, or caretaker as the court may specify; or
b. Place the juvenile in the custody of a parent, relative, private agency offering placement services, or some other suitable person; or
c. Place the juvenile in the custody of the department of social services in the county of the juvenile's residence.... If a juvenile is removed from the home and placed in custody or placement responsibility of a county department of social services, the director shall not allow unsupervised visitation with, or return physical custody of the juvenile to, the parent, guardian, custodian, or caretaker without a hearing at which the court finds that the juvenile will receive proper care and supervision in a safe home. ...
(3) In any case, the court may order that the juvenile be examined by a physician, psychiatrist, psychologist, or other qualified expert as may be needed for the court to determine the needs of the juvenile....
N.C. Gen.Stat. § 7B-903(a) (emphasis added). The statute specifies no other dispositional alternatives. It, however, repeats the caveat also contained in N.C. Gen.Stat. § 7B-906(g) that "[i]f the court determines that the juvenile shall be placed in the custody of an individual other than the parents..., the court shall verify that the person receiving custody ... of the juvenile understands the legal significance of the placement... and will have adequate resources to care appropriately for the juvenile." N.C. Gen. Stat. § 7B-903(c).
The disposition entered in this case provided:

*422 the primary physical custody of the juvenile shall be with the respondent mother, [C.B.], but with the physical placement of the juvenile to be with her maternal grandfather, [T.A.], provided that the respondent mother is in the home of [T.A.] all evenings to assist with the minor child's school preparation from the time school lets out to the time [the child] goes to school in the morning.
This is not a disposition permitted by N.C. Gen.Stat. § 7B-903. Nothing in that statute permits a court to grant physical custody to a parent, but order "physical placement" to be with another person. Except when custody has been granted to DSS, the statute anticipates that any person with whom the child is "placed" shall be given custody. Yet, this Court has recently held, in the Chapter 50 custody context, that approval of physical placement with a grandparent  when physical custody has been granted to a parent  does not grant the grandparent any custodial rights. Everette v. Collins, ___ N.C.App. ___, ___, 625 S.E.2d 796, 799 (2006).
The disposition ordered below is also inconsistent with the concept of "physical custody." As the leading commentator on North Carolina family law has explained, "[t]he law uses the phrase `physical custody' to refer to the rights and obligations of the person with whom the child resides." 3 Suzanne Reynolds, Lee's North Carolina Family Law § 13.2, at 13-16 (5th ed.2002) (emphasis added). Here, the trial court purported to grant physical custody to a parent who does not reside with the child. Indeed, the court's order reflects this inherent inconsistency. While the child is required to live with the maternal grandfather, the order, in a nod to physical custody, includes the patently unrealistic specification that the child's mother spend every night at the grandfather's home rather than with her husband. Meanwhile, the maternal grandfather, whatever his good intentions, has no legal ability to make daily decisions affecting the child's welfare. Nothing in the Juvenile Code suggests that this type of disposition is appropriate.
Everette is not to the contrary. It addressed only whether the trial court, in applying Chapter 50, "violated [the mother's] constitutional rights by approving of [the child's] physical placement with the paternal grandmother." ___ N.C.App. at ___, 625 S.E.2d at 799. The mother, who was physically incapable of caring for the child, contended that it was a "backdoor" way to grant the grandmother custody of the child. Id. The father, who had previously been awarded temporary physical custody, was in the military, had returned from active duty in Iraq, had chosen to place his child with his mother because of his continuing military service, and visited with his child every weekend. Id. at ___, 625 S.E.2d at 798. The trial court did not order placement with the paternal grandmother, but rather approved of the father's decision, in light of his military commitment, to place the child with the grandmother. Everette does not authorize an order under N.C. Gen.Stat. § 7B-903 granting physical custody to a parent, but ordering that the child will live elsewhere.[1]
Further, the trial court's findings of fact do not support its conclusion that physical custody should be awarded to the mother. N.C. Gen.Stat. § 7B-903(a)(2)(c) prohibits DSS from returning physical custody to the parent from whose custody the child was removed without a hearing at which the court "finds that the juvenile will receive proper care and supervision in a safe home." A "safe home" is defined as "[a] home in which the juvenile is not at substantial risk of physical or emotional abuse or neglect." N.C. Gen.Stat. § 7B-101(19). It is inconceivable that the General Assembly would preclude DSS from restoring custody to a parent without this judicial finding, while allowing a court to restore custody without making the same finding. We, therefore, hold that, prior to returning a child to the custody of a parent from whose custody the child was originally taken, a trial court must find that the child will receive from that parent proper care and supervision in a safe home.
In this case, the trial court made only a single finding of fact addressing the mother's *423 fitness to have physical custody: "[S]ince the initial adjudication hearing the mother has had installed an insulin pump to regulate her medical condition of diabetes and the Court notes that there is a physical difference in her appearance and demeanor for the betterment." Nothing in the order addresses the conduct that resulted in an adjudication of neglect and a determination that reunification efforts with the mother and stepfather would "clearly be futile." The court made no findings suggesting that the longstanding and deep-seated problems with domestic violence between the mother and stepfather, reflected in the court's prior orders, had been resolved.[2] Indeed, the court's attempt to place the child with the maternal grandfather implies that it did not think the mother could provide "proper care and supervision in a safe home."
We also note that the trial court made only one finding of fact regarding why it was not in the best interests of the child for physical custody to be continued with her father: "The minor child is not totally happy in her current physical residence; the minor child missed her animals, her mother, her grandfather, and [the stepfather]; and the minor child is glad that her biological father is in her life now." This finding is not, standing alone, sufficient. It reflects no specific problem with the current physical residence. And, the fact that, along with missing her grandfather and animals, the child misses the two people who were adjudicated to have neglected her, can hardly support a finding that it is not in her best interests for custody to remain with her father.
It appears from the transcript that the principal basis for the change in custody was the fact that the father was unmarried. Such reasoning was explicitly rejected by the United States Supreme Court in 1972. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court held that Illinois could not automatically consider a father unfit as a parent by virtue of the fact that he was not married; rather, individualized findings of unfitness must be made. The Court wrote:
It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents. It may also be that Stanley [the father in this case] is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children.... [N]othing in this record indicates that Stanley is or has been a neglectful father who has not cared for his children. Given the opportunity to make his case, Stanley may have been seen to be deserving of custody of his offspring.
Id. at 654-55, 92 S.Ct. at 1214, 31 L.Ed.2d at 560-61. See also, e.g., Davis v. Davis, 78 Ariz. 174, 178, 277 P.2d 261, 264 (1954) ("That Mrs. Davis has remarried does not automatically mean that Mr. Davis' bachelor residence is unfit. A showing of unfitness must be made  which we fail to find."); In re Guardianship of Cameron D., 14 Neb. App. 276, 706 N.W.2d 586, 593-94 (2005) ("We find that the evidence of [the mother's] relationship or marital status does not support a finding that [the mother] is unfit to perform the duties imposed by her parental relationship.... [There is] merit to [the mother]'s assertion that the court erred in determining that [the mother] is unfit by reason of her [non-marital] relationship or living arrangement.").
In sum, we hold that the trial court's conclusion of law that it is in the child's best interest to place her in the primary physical custody of her mother is unsupported by the findings of fact. Further, the disposition ordered by the trial court is not a disposition authorized by statute. We, therefore, reverse and remand for further proceedings in accordance with this opinion.
Reversed and remanded.
Judges McGEE and CALABRIA concur.
NOTES
[1] In the mother's appeal from the initial adjudication, this Court was not asked to address  and did not address  whether this type of disposition is permissible.
[2] We note that the General Assembly has mandated in Chapter 50 proceedings that a trial court consider "acts of domestic violence" when determining the best interest of the child in custody proceedings. N.C. Gen.Stat. § 50-13.2(a) (2005).