IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-787

No. COA22-240

Filed 6 December 2022

Brunswick County, No. 18 JA 110

IN THE MATTER OF: T.D.N.

Appeal by Respondent-Mother from an order entered 16 September 2021 by Judge Pauline Hankins in Brunswick County District Court. Heard in the Court of Appeals 21 September 2022.

*Mark L. Hayes, for Respondent-Mother.*

*Jane R. Thompson, for Brunswick County Department of Social Services, Petitioner-Appellee.*

*N.C. Administrative Office of the Courts Guardian ad Litem Program, by Michelle FormyDuval Lynch, for Guardian ad Litem.*

WOOD, Judge.

¶ 1    Respondent-Mother appeals the modification of a permanency planning order that terminated efforts to reunite Mother with her child. We hold competent evidence supports the trial court's factual findings, but certain factual findings, legal conclusions, and decrees are materially inconsistent. We vacate and remand the order.

## I.    Background

¶ 2        On 24 February 2017, Todd[1] was born to Mother and Father. Todd has medical diagnoses which affect his development such that he experiences seizures and requires constant medical attention.

¶ 3        On 18 November 2019, Brunswick County Department of Social Services ("DSS") visited Mother's home after receiving a concerning report that Mother had been impaired while caring for Todd. While DSS was at Mother's home, Mother was not able to stand without support, spoke with slurred speech, and was not able to properly focus. Mother was belligerent toward DSS, Father, and law enforcement, who soon arrived upon the request of DSS. DSS later took custody of Todd and removed him from the home.

¶ 4        On 27 November 2019, the trial court continued nonsecure custody of Todd with DSS and ordered Mother to have a minimum of one hour supervised visitation with Todd every week. The trial court further ordered Mother to work with DSS to develop a case plan to "allow her to be intricately [sic] involved in the child's care."

¶ 5        On 12 December 2019, the trial court conducted another nonsecure custody hearing and continued custody with DSS. The trial court ordered Mother to cooperate with medical staff at Duke Hospital where Todd frequently was seen due to his developmental diagnoses.

---

[1] A pseudonym is used here to protect the identity of the child.

¶ 6     On 31 March 2020, the trial court adjudicated Todd a neglected juvenile. Mother stipulated that she was not able to properly care for or supervise the child at the time of the 18 November 2020 incident and that she "created an environment injurious to the welfare of the juvenile." The trial court cited Mother's mental instability as a contributing factor in the initial adjudication order. This same day, the trial court entered a disposition order. The trial court ordered Todd to remain in the legal and physical custody of DSS. Mother and Father were permitted unsupervised time with Todd for four and a half hours every day. DSS was ordered to pursue reunification efforts between Todd and his parents while they worked to comply with their case plans. The case plans had Father and Mother pursue mental health treatment, cooperate with Todd's in-home nursing staff, re-establish occupational and speech therapy services for Todd, and dispose of Todd's expired prescription medications.

¶ 7     On 19 August 2020, the trial court entered a review order and authorized DSS to begin a trial home placement with Mother. However, on 30 October 2020, the trial court entered a permanency planning order which modified Mother's contact with Todd due to concerns about her ability to properly supervise or care for him by herself following a home visit by a DSS worker on 30 September 2020. On that day, a DSS worker visited the home and observed Todd alone in the living room. Mother was nowhere to be seen, and, after forty-five minutes of repeated attempts to have

someone answer the door, the DSS worker gained entry with the aid of law enforcement. Mother was found asleep in her bed while Todd stood in hot bathwater. When Mother came-to, she was "incoherent" and "had to brace herself while walking." Until this incident, DSS recommended that Mother should receive custody of Todd at the next hearing. The trial court ordered Todd could remain in Mother's home but that Mother "shall be supervised at all times around [Todd] by an individual vetted and approved by the Department." DSS had in-home nursing care provide nineteen hours of supervision while Father supervised five hours after he finished work for the day. At this point, Todd remained in DSS' custody and reunification with Mother remained a primary plan.

¶ 8        Shortly after the previous incident, Mother enrolled in a twelve-week drug rehabilitation program. Todd was removed from Mother's home and placed in a foster home on 12 November 2020, while Mother was absent. Todd remained in foster care after Mother's return.

¶ 9        On 31 December 2020, the trial court ordered DSS to arrange for Todd to participate in a developmental screening. This was necessary so that DSS could coordinate daycare services for Todd; however, Mother refused to consent to the screening.

¶ 10        On 11 January 2021, the trial court entered another permanency planning order which relieved DSS of reunification efforts with Father, largely due to Father

not having housing and his unwillingness to participate in services to assist him in finding housing. However, Father was still permitted to visit with Todd unsupervised and was allowed to serve as a respite provider. Todd's foster parents noted Todd "struggled with engaging with the other children and appears to lack social skills" but believed that he could excel if placed in a program with proper assistance and training. Todd bit other children in the home. He was not permitted to be placed in a daycare due to Mother's objections to immunizations for religious reasons. He was subsequently placed in the home of a married couple without other children where the foster parents noticed that Todd appeared to struggle with separation anxiety. Mother was able to participate in shared parenting with these providers. At this time, Mother was willing to attend an inpatient treatment program so that she could work to regain her ability to properly care for Todd. The trial court noted that Mother was making adequate progress with her case plan and was cooperating with the court, DSS, and the Guardian *ad Litem*. However, the trial court did not return custody of Todd to Mother "as it is contrary to the juvenile's health and safety, however, it may be possible within the next six months, provided his parents are able to satisfactorily complete the requirements of the Family Services Case Plan and demonstrate an ability to provide proper care for the child." Thus, Todd remained in DSS' legal and physical custody.

¶ 11        On 18 February 2021, the trial court entered another permanency planning

order maintaining Todd in the custody of DSS and reinstating reunification efforts with Father. The court noted that Todd was currently residing in his fourth foster home but that there were no concerns about his well-being. Mother, at this time, was able to visit with Todd for a minimum of one hour per week and remained opposed to immunizing him. The court noted that during a visit, Mother became concerned about a diaper rash and accused the social worker of sexually abusing Todd. The caregiver took him to the doctor and confirmed that Todd merely suffered from a diaper rash. The trial court noted that Mother was "relentlessly" calling Todd's foster parents from 9:00 p.m. to 2:00 a.m. and questioning and criticizing their care of Todd. DSS reported that she had done this with other placement providers as well. These incidents took place almost one year after Mother participated in a comprehensive clinical assessment on 13 March 2020. The assessment recommended that Mother take part in an outpatient program "to manage depressive symptoms and anxiety."

¶ 12    On 20 May 2021, the trial court entered an order denying DSS' request to have Todd vaccinated because he was enrolled in a daycare that did not require vaccinations. Mother remained opposed to Todd receiving any vaccinations for religious reasons and from fear that, due to his Epilepsy and other medical issues, he might suffer greater harm.

¶ 13    During the hearing, a medical expert testified that he did not see a problem with Todd receiving vaccinations, but he would not vaccinate Todd against Mother's

wishes. On this same day, the trial court entered another permanency planning order. The order did not materially alter the prior order except that visitation with the parents was modified, and the trial court noted that Mother continued to call the foster parents at odd hours of the night and had called Todd to tell him that he would be coming home with her that day.

¶ 14    On 16 September 2021, the trial court entered another permanency planning order and eliminated reunification with the parents as a permanent plan due to inadequate progress in their case plan to address the issues that led to Todd coming into the custody of DSS. In its order, the trial court referenced several incidents tending to show Mother had not demonstrated mental stability and was no longer cooperating with DSS. For instance, Mother accused the foster parents of not feeding Todd and claimed he was losing weight, although his pediatrician confirmed his weight gain. Mother "would not allow the nursing staff to complete required tasks, like evaluating [Todd's] vitals." Mother missed therapy appointments and tested positive for Fentanyl on 19 July 2021. The trial court found concerns about Mother's use of her prescribed medications due to DSS' report. Additionally, Mother and Father continued to raise suspicions with Todd's placement and said that Todd "will die in foster care." In another instance, Mother falsely alerted the hospital that Todd had been kidnapped and pointed to bruises on his body which she claimed were needle marks. She alleged that he had been subjected to abuse. The examining doctor did

not notice any issues but ordered a chest and pelvic X-Ray due to Mother's concerns. Mother, at one point, called 911 to have an officer visit Todd's placement provider to perform a welfare check at approximately midnight before also contacting a detective with concerns about her son. An anonymous report from "[Mother's] friend" was made to the Horry County Abuse and Neglect Hotline alleging abuse to Todd. Mother claimed that Todd had a broken rib before an X-Ray revealed otherwise. Mother eventually revoked her consent to allow Columbus County Schools to conduct a child development assessment of Todd so that he could enter kindergarten. In sum, the trial court noted generally that Mother had "not demonstrated mental stability" and was "minimally cooperating with the Department and the Guardian *ad Litem*."

¶ 15 The trial court ordered Mother and Father to continue with their case plans, Mother to cooperate with medical service providers, and Mother to "participate in a psychological assessment that includes a parental capacity assessment." The trial court noted that Todd was now four years old and in his sixth foster home, had learned some sign language, and was potty trained. Although the daycare had not reported any concerns during pick-up and drop-off, DSS expressed concerns that Mother returned Todd to the caretaker numerous times naked or wearing pullups, although being potty trained.

¶ 16 The trial court made findings about many other occurrences to support its finding that Mother had not demonstrated mental stability and was no longer

cooperating with DSS. Finally, the court found that

> 51. Continued efforts toward reunification clearly would be unsuccessful, futile, inconsistent and contrary to the health, safety and best interests of the child to secure a safe, stable home within a reasonable period of time and the Department should continue to be relieved of same.
>
> 52. That legal custody of the juvenile cannot be returned to the parents today as it is contrary to the juvenile's health and safety, however, it may be possible within the next six months, provided his parents are able to satisfactorily complete the requirements of the Family Services Case Plan and demonstrate an ability to provide proper care for the child.

Upon these findings, the trial court relieved DSS of reunification efforts and established the new concurrent plan, "the primary plan being custody with a court-approved caregiver and the secondary plan being guardianship."

On 14 December 2021, Mother filed a timely notice of appeal of the permanency planning order alleging that material portions of the order were improperly contradictory and that several findings of fact were not supported by competent evidence.

## II. Standard of Review

We review a permanency planning order to determine "whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law." *In re J.T.*, 252 N.C. App. 19, 20, 796 S.E.2d 534, 536 (2017) (quoting *In re P.O.*, 207 N.C. App. 35, 41, 698 S.E.2d 525, 530 (2010)). "If the

trial court's findings of fact are supported by any competent evidence, they are conclusive on appeal." *Id.* Conclusions of law are reviewed *de novo. Id.*

### III. Discussion

After a child is adjudicated neglected and the court orders an initial disposition, the court holds review or permanency planning hearings. N.C. Gen. Stat. § 7B-906.1(a) (2021). At the conclusion of each permanency planning hearing, the court must make specific findings as to the best permanent plan to achieve a safe, permanent home for the juvenile within a reasonable period of time. *Id.* By statute,

> [r]eunification shall be a primary or secondary plan unless
> the court made written findings under G.S. 7B-901(c) or
> G.S. 7B-906.1(d)(3), the permanent plan is or has been
> achieved . . . , or the court makes written findings that
> reunification efforts *clearly would be unsuccessful* or *would
> be inconsistent with the juvenile's health or safety*.

N.C. Gen. Stat. § 7B-906.2(b) (emphasis added). Since here the trial court did not make findings pursuant to sections 7B-901(c) or 7B-906.1(d)(3) and did not conclude that the permanent plan was unachieved, we look to see if the trial court made "written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." *Id.* We note here that the trial court did appropriately make both findings. Within this framework, we now consider Mother's arguments.

### A. Material Contradictions

Mother first argues that several findings, conclusions, and decrees materially

contradict others within the trial court's order. As with orders terminating parental rights,

> [i]t is not unusual for an order . . . to include both favorable and unfavorable findings of fact regarding a parent's efforts to be reunited with a child, and the trial court then weighs all the findings of fact and makes a conclusion of law based upon the findings to which it gives the most weight and importance.

*In re A.B.*, 239 N.C. App. 157, 166, 768 S.E.2d 573, 578 (2015). Such competing findings are not forbidden and should be encouraged. *See In re A.B. J.B.*, 245 N.C. App. 35, 47, 781 S.E.2d 685, 693 (2016). However, this Court cannot uphold an order supported by findings which "are actually antagonistic, inconsistent, or contradictory such that the reviewing court cannot 'safely and accurately decide the question.' " *Spencer v. Spencer*, 70 N.C. App. 159, 168, 319 S.E.2d 636, 643-44 (1984) (quoting *Lackey v. Hamlet City Bd. of Ed.*, 257 N.C. 78, 84, 125 S.E.2d 343, 347 (1962)).

¶ 22    Here, Mother specifically challenges findings of fact 24 and 52, conclusion of law 4, and decrees 5 and 8. She claims these writings are irreconcilable with the cessation of reunification efforts.

> [Finding] 24. There are continued concerns regarding medications that [Mother] is currently taking, and the Department would like for [Mother] to receive a medication evaluation.

> [Finding] 52. That legal custody of the juvenile cannot be returned to the parents today as it is contrary to the juvenile's health and safety, however, it may be possible

> within the next six months, provided his parents are able to satisfactorily complete the requirements of the Family Services Case Plan and demonstrate an ability to provide proper care for the child.
>
> [Conclusion] 4. [Mother] should make her best efforts to fully comply with the goals and objectives of her case plan.
>
> [Decree] 5. The Respondent parents are ordered to work with the social worker, the placement providers and the treatment team at Duke in a productive manner moving forward.
>
> [Decree] 8. [Mother] shall participate in a psychological assessment that includes a parental capacity assessment.

¶ 23    Competent evidence in the record supports finding of fact 24. Though Mother urges this Court to consider the contradictory nature of DSS' recommended medication evaluation when reunification efforts have ceased, the trial court is not prohibited from noting DSS' concerns. Although DSS is seeking to be relieved of reunification efforts with Mother, nothing precludes Mother from continuing to address DSS' and the trial court's concerns in an attempt to ultimately reunify with her child. The court did not order termination of mother's parental rights. It changed "the primary plan [to] custody with a court-approved caregiver and the secondary plan [to] guardianship."

¶ 24    Finding of fact 52, on the other hand, is troubling. Immediately preceding this finding, in finding 51, the trial court writes, "[R]eunification clearly would be unsuccessful [and] futile." This finding is necessary before the trial court may allow

DSS to cease reunification efforts with the parents in accordance with N.C. Gen. Stat. § 7B-906.2(b) (2021) ("Reunification shall be a primary or secondary plan unless the court . . . makes written findings that reunification efforts clearly would be unsuccessful . . . ."). In finding 52, by contrast, the court states that reunification "may be possible within the next six months." A finding that "reunification clearly would be unsuccessful [and] futile" and a finding that reunification "may be possible within the next six months," are materially contradictory. Reunification cannot be both futile and possible. This contradiction amounts to more than a mere clerical error and cannot be reconciled with the previous finding in order to relieve DSS of reunification efforts. *See In re A.S.*, 275 N.C. App. 506, 511, 853 S.E.2d 908, 912 (2020); *In re A.P.W.*, 378 N.C. 405, 2021-NCSC-93, ¶ 31 ("the trial court satisfied the substance of N.C.G.S. § 7B-906.2(b) by finding that '[i]t is not possible for the children to be returned to the home of a parent or within the next six months and it would be contrary to the children's health and safety and their general welfare to be returned to the home of a parent.' "). Certainly, reunification "efforts" by DSS could be "futile" based on mother's uncooperative history but be "possible" if Mother changes her behaviors. We emphasize, however, that a permanency planning order directs the efforts of DSS—not the efforts of Mother to regain reunification. *In re E.A.C.*, 278 N.C. App. 608, 2021-NCCOA-298, ¶ 37. Though "[t]he focus of [Section 7B-906.2(b)] is on the actions of the parents," *In re J.M.*, 276 N.C. App. 291, 2021-NCCOA-92, ¶

24, the permanency planning order must direct DSS "to make efforts toward finalizing the primary and secondary permanent plans." N.C. Gen. Stat. § 7B-906.2(b) (2021).

Also in finding 51, the trial court states that DSS should "continue" to be relieved of reunification efforts when the prior primary plan had been reunification. Standing alone, this apparent oversight might be considered clerical error or needless "surplusage" as the Guardian *ad Litem* suggests. Yet, taken together, "the internal inconsistencies of the order go far beyond" this one issue, and we cannot ignore it. *In re A.B.*, 239 N.C. App. 157, 167, 768 S.E.2d 573, 579 (2015).

Contrary to the Guardian *ad Litem* and DSS' contention, this case is distinguishable from *In re M.T.-L.Y.* In that case, the mother also alleged a contradiction in the findings of fact.

> In finding of fact 30, the trial court found that "[t]here is a *slim likelihood* of reunification with [Mother] within the next six months as [she] *may have completed* some of the court ordered requirements in [Virginia]," but "has failed to provide verification of this to date." (emphasis added). But finding of fact 33 determined that "[Mother is] *not making adequate progress* within a reasonable period of time under the plan."

*In re M.T.-L.Y.*, 265 N.C. App. 454, 467, 829 S.E.2d 496, 505 (2019). This Court did not take issue with the apparent contradiction when "the trial court was merely performing its statutory mandate in determining the likelihood of reunification

between [the child] and Mother in the following months" consistent with the requirements of N.C. Gen. Stat. § 7B-906.1(e)(1). *Id.* at 467, 829 S.E.2d at 506. More specifically, this Court held that the finding could not have been contradictory because "partially performing a required condition does not necessarily preclude a conclusion that the performance is inadequate." *Id.* Here, by contrast, the finding that reunification efforts would clearly be unsuccessful and futile and DSS' release from all reunification efforts most certainly would thwart the possibility of Mother being reunited with her child given the court's findings about her mental health instability.

¶ 27 Concerning conclusion of law 4, a decision that Mother should continue with her case plan could be perceived as contradictory because, by removing reunification efforts as a primary plan, it does not follow that Mother should continue to pursue a case plan as if reunification were still an objective. However, DSS is the party relieved of making reunification efforts, not she. If Mother still desires to reunify with her child before a permanent plan is achieved, then it follows that she should continue to comply with her case plan to correct the conditions which led to the removal of her child from her home.

¶ 28 As to decree 5 that orders Mother to work with the social workers, placement providers, and hospital staff, DSS was relieved of reunification efforts, but Mother is still afforded visitation. In order to effectuate visitation or to be able to participate

in Todd's medical treatment, she will necessarily need to work with the social worker, placement providers, and hospital staff. Again, DSS was relieved of making efforts toward reunification, but that does not preclude Mother from making her own efforts, as she is able, to "possibly" reunify with her child.

¶ 29 We agree, however, with Mother's contention that decree 8 is contradictory at this stage of the proceedings. The trial court ordered Mother to undergo a psychological evaluation that includes a parental capacity assessment. Mother has been working with DSS for four years and has undergone mental health evaluations. This evaluation specifically would have Mother also complete a "parental capacity assessment." Such an evaluation would be unnecessary if reunification were no longer a goal. Further, the trial court did not make a finding that such an evaluation would be in the child's best interest. If reunification were still the goal, then a presumption could be made that Mother completing the evaluation would be in the child's best interest. As the DSS worker noted in her testimony, this evaluation would "give us some guidance regarding the best and most appropriate permanent plan." Paradoxically, by ordering the evaluation, the trial court held that such measure might aid in a reunification determination while simultaneously holding that reunification was futile.

¶ 30 DSS and the Guardian *ad Litem* argue that these apparent inconsistencies amount to mere clerical errors and that the overwhelming majority of the trial court's

findings logically support the conclusion that reunification efforts should cease. Clerical error, in this context, "is an error resulting from a minor mistake or inadvertence, especially in writing or copying something on the record, and not from judicial reasoning or determination." *In re A.S.*, 275 N.C. App. 506, 511, 853 S.E.2d 908, 912 (2020) (quoting *In re R.S.M.*, 257 N.C. App. 21, 23, 809 S.E.2d 134, 136 (2017)). For the reasons outlined above, it is not clear to us that the trial court's inclusion of findings 51 and 52 and decree 8 was the result of "a minor mistake or inadvertence."

## IV.    Conclusion

Because the trial court's findings and decrees contain irreconcilable contradictions to the trial court's cessation of reunification as a permanent plan, we vacate and remand to the trial court for further consideration and findings not inconsistent with this opinion.

VACATED AND REMANDED.

Judge TYSON concurs.

Judge CARPENTER concurs in part and dissents in part by separate opinion.

No. COA22-240 – *In re T.D.N.*

CARPENTER, Judge, concurring in part and dissenting in part.

¶ 32    I respectfully disagree with my colleagues in holding that finding of fact 51 and finding of fact 52 collectively constitute a "material contradiction," requiring the trial court's order to be vacated and remanded. Furthermore, I disagree with the majority's reason for vacating decree 8. Therefore, I dissent in part. I would hold finding of fact 52 is unsupported by the evidence, and the remaining findings and the record support the trial court's cessation of reunification efforts. In addition, I would hold the trial court erred in entering decree 8 because it did not find that T.D.N.'s best interests require Respondent-Mother to undergo a psychological evaluation.

¶ 33    North Carolina General Statute § 7B-906.2(b) governs when reunification efforts may be eliminated by the trial court:

> Reunification shall be a primary or secondary plan unless the court made written findings under [N.C. Gen. Stat. §] 7B-901(c) or [N.C. Gen. Stat. §] 7B-906.1(d)(3), the permanent plan is or has been achieved in accordance with subsection (a1) of this section, or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. *The finding that reunification efforts clearly would be unsuccessful or inconsistent with the juvenile's health or safety may be made at any permanency planning hearing, and if made, shall eliminate reunification as a plan.*

N.C. Gen. Stat. § 7B-906.2(b) (2021) (emphasis added).

¶ 34    In this case, the trial court made finding of fact 51, which is sufficient to eliminate reunification as a plan, pursuant to N.C. Gen. Stat. § 7B-906.2(b). Finding

of fact 51 provides: "Continued efforts toward reunification clearly would be unsuccessful, futile, inconsistent and contrary to the health, safety, and best interests of the child to secure a safe, stable home within a reasonable period of time and [DSS] should continue to be relieved of same." In conclusion of law 7, the trial court relieved DSS of reunification efforts with Respondent-Parents. The trial court then set the new primary plan for the juvenile as custody with a court-approved caregiver and the new secondary plan as guardianship.

## V. Challenged Findings of Fact

¶ 35     In considering Respondent-Mother's argument that finding of fact 51 and finding of fact 52 are inconsistent, the majority concludes "[a] finding that 'reunification clearly would be unsuccessful [and] futile,' and a finding that reunification 'may be possible within the next six months,' are materially contradictory" because "[r]eunification cannot be both futile and possible." Based in part on this apparent discrepancy, the majority has chosen to vacate and remand the order in its entirety. Because I conclude the record and the remaining findings leave no doubt as to the trial court's intention to cease reunification efforts, I would affirm the order in part. For reasons discussed in section II, I would vacate decree 8 of the order.

¶ 36     First, I acknowledge finding of fact 8 addresses the possibility of Respondent-Parents obtaining *physical custody* in the next six months and provides in pertinent

part: "In accordance with [N.C. Gen. Stat. §] 7B-906.1(e)(1), it is not possible for the juvenile to be returned to his parents within the next 6 months due to the inadequate progress towards the case plan in addressing the concerns that have led to [DSS's] involvement." Respondent-Parents do not challenge finding of fact 8, and it is therefore "binding on appeal." *See In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019).

¶ 37 On the other hand, finding of fact 52 addresses the possibility of Respondent-Parents obtaining *legal custody* in the next six months:

> That legal custody of the juvenile cannot be returned to the parents today as it is contrary to the juvenile's health and safety, however, it may be possible within the next six months, provided his parents are able to satisfactorily complete the requirements of the Family Services Case Plan and demonstrate an ability to provide proper care for the child.

¶ 38 Our Juvenile Code sets forth the dispositions the trial court may order: "At any review hearing, the court may maintain the juvenile's placement under review or order a different placement, appoint an individual guardian of the person pursuant to [N.C. Gen. Stat. §] 7B-600, or order any disposition authorized by [N.C. Gen. Stat. §] 7B-903 . . . ." N.C. Gen. Stat. § 7B-906.1(d1) (2021).

¶ 39 The grant of legal custody to the juvenile's parents, while physical custody remains with DSS or another placement, is not a disposition authorized under N.C. Gen. Stat. § 7B-906.1, nor is it an alternative disposition allowed under N.C. Gen.

Stat. § 7B-903. *See* N.C. Gen. Stat. § 7B-906.1(d1); N.C. Gen. Stat. § 7B-903 (2021). Therefore, the trial court erred in making two findings, which taken together, support a disposition not permitted by statute. *See In re H.S.F.*, 177 N.C. App. 193, 202, 628 S.E.2d 416, 422 (concluding the trial court's grant of physical custody to the juvenile's parent and order of physical placement with the juvenile's grandfather was not permitted by the Juvenile Code), *disc. rev. denied*, 360 N.C. 534, 633 S.E.2d 817 (2006).

¶ 40    DSS and the guardian *ad litem* both cite *In re Brenner* for the proposition that this Court can affirm an order containing inconsistencies where "[t]he record resolves the conflict" and no other result could follow from the evidence and remaining findings. 83 N.C. App. 242, 254, 350 S.E.2d 140, 148 (1986). There, two findings of fact, which our Court deemed conclusions of law, were "in direct conflict." *Id.* at 254, 350 S.E.2d at 148. We affirmed the trial court's decision where the record left no doubt as to the trial court's intentions. *Id.* at 254, 350 S.E.2d at 148.

¶ 41    Here, like *In re Brenner*, "[t]he record resolves the conflict" because finding of fact 52 is not supported by competent evidence and is inconsistent with finding of fact 8 and numerous other findings made by the trial court. *See id.* at 254, 350 S.E.2d at 148. It is clear the trial court did not intend to consider granting Respondent-Parents legal custody of T.D.N. within the next six months where the remaining findings support the cessation of reunification with Respondent-Parents and where the trial

court found Respondent-Parents could not obtain physical custody of T.D.N. in the next six months. Moreover, at the conclusion of the 11 August 2021 permanency planning hearing, the trial court orally announced extensive findings, supporting its decision to cease reunification efforts with Respondent-Parents. The trial court noted it had "some serious concerns in th[e] matter," and made specific findings relating to Respondent-Mother's actions during the pendency of the case, including "her attempts to sabotage placement" and her making false reports concerning T.D.N.'s welfare. It also made findings regarding Respondent-Parents' non-compliance with their case plans. The trial court expressly found legal and physical custody would remain with DSS. Contrary to written finding of fact 52, the trial court did not find at the hearing that T.D.N. may be returned to Respondent-Parents within the next six months. Therefore, I conclude finding of fact 52 is unsupported by competent evidence in the record. *See In re J.T.*, 252 N.C. App. 19, 20, 796 S.E.2d 534, 536 (2017) ("This Court's review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law.").

## VI.   Decree 8

¶ 42        Next, the majority concludes the trial court's mandate for Respondent-Mother to undergo a psychological evaluation, including a parental capacity assessment, "would be unnecessary if reunification were no longer a goal." Because the trial court

did not satisfy the statutory requirement of determining the best interests of the juvenile, I would not reach the issue of whether the court's mandate for Respondent-Mother to complete a psychological evaluation was needed.

¶ 43    North Carolina General Statute § 7B-904 governs the trial court's authority over parents of a juvenile adjudicated as abused, neglected, or dependent. N.C. Gen. Stat. § 7B-904 (2021). In order for the trial court to order a parent to complete a psychological evaluation, it must "determine whether the best interests of the juvenile require" such an assessment. N.C. Gen. Stat. § 7B-904(c).

¶ 44    In this case, the trial court's written order is silent as to whether T.D.N.'s best interests require Respondent-Mother to complete a psychological evaluation. Therefore, the trial court did not fulfill the statutory requirement of N.C. Gen. Stat. § 7B-904(c). Accordingly, I would vacate decree 8.

## VII.    Conclusion

¶ 45    I agree with the majority that finding of fact 24 is supported by the evidence and that conclusion of law 4 is supported by findings of fact. Additionally, I agree that the trial court did not error in entering decree 5. I disagree with the majority's conclusion that finding of fact 51 and finding of fact 52 create an "irreconcilable contradiction," requiring this Court to vacate the entire order. I conclude finding of fact 52 is unsupported by the evidence. Further, I conclude the trial court erred in entering decree 8 because it did not determine that T.D.N.'s best interests require

*Carpenter, J., concurring in part and dissenting in part*

Respondent-Mother to undergo a psychological evaluation. Accordingly, I would vacate only decree 8 and affirm the rest of the permanency planning order. As such, I concur in the majority's opinion in part and dissent in part.